**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| S.M.A., an individual, | |
| Plaintiff | |
| v. | CIVIL ACTION NO. _____ |
| SALESFORCE, INC.; BACKPAGE.COM, LLC, AND CARL FERRER | |
| Defendants. | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Comes now, Jane Doe S.M.A., Plaintiff in the above-styled and numbered cause, and files this Original Petition complaining of Defendants, SALESFORCE, INC (hereinafter referred to as "Salesforce"), BACKPAGE.COM, LLC and CARL FERRER (hereinafter referred to as "Backpage" or "Backpage Defendants") and respectfully shows the Court as follows:

## I.  SUMMARY OF CASE

1.      Sex trafficking is a public health crisis that has hit epidemic proportions in our communities, resulting in a devastating effect on its survivors and a crushing financial effect on our world. In 2019, Governor Abbot formally declared sex trafficking a public health crisis in Texas.[1]

2.      This is a case about tech companies knowingly benefitting from the proliferation and promotion of sex trafficking and prostitution.  Law enforcement will never have a chance at defeating or reducing this crisis if tech companies are able to continue to actively facilitate the promotion of criminal activity without accountability.

---

[1] https://capitol.texas.gov/tlodocs/86R/billtext/pdf/HC00035F.pdf#navpanes=0

3.      Estimates are that in 2016 there were as many as 40.3 million victims of human trafficking and sexual exploitation worldwide, including 4.8 million people trapped in sexual exploitation.[2]

4.      The exploitation of victims of sex trafficking and prostitution most often does not occur solely at the hands of the traffickers and sex buyers. Rather, technology companies and hotels often play an equal hand in the exploitation of these victims.

**The Role of Big Tech**

5.      Formerly, the sale of sex occurred face to face. If a buyer wanted to purchase sex, they would have to leave their home or hotel, locate the victim and conduct the transaction in person. With the development of technology, that is no longer the case. Technology has transformed the commercial sex trade, and, in the process, has contributed to the explosion of domestic sex trafficking and compelled prostitution.

6.      Backpage was the leading online marketplace for the sale of sex and sex trafficking prior to being seized by the FBI in April of 2018. "Shutting down the largest online U.S. marketplace for sex trafficking will dramatically reduce the profitability of forcing people into the commercial sex trade, at least in the short term," said Bradley Myles, chief executive of Polaris, an international anti-slavery group that runs the National Human Trafficking Hotline.[3]

7.      The National Association of Attorneys General described Backpage as a "hub" of "human trafficking, especially the trafficking of minors." [4]

---

[2] INT'L LABOUR OFFICE, *Global estimates of modern slavery: Forced labour and forced marriage*, at 9, 38, https://www.ilo.org/wcmsp5/groups/public/---dgreports/---dcomm/documents/ publication/wcms_575479.pdf.
[3]  https://www.reuters.com/article/us-usa-backpage-justice/sex-ads-website-backpage-shut-down-by-u-s-authorities-idUSKCN1HD2QP
[4] See https://agportal-s3bucket.s3.amazonaws.com/uploadedfiles/Home/News/Press_Releases/ 2011/NAAG_Backpage_Signon_08-31-11_Final.pdf, and the press release at https://www.atg.wa.gov/news/news-releases/attorneys-general-backpagecom-prove-you-re-fighting-human-trafficking

8.      Thus, it was repeatedly reported and was public knowledge at all relevant times that Backpage was a sex trafficking website.

9.      During 2013-2015, Backpage earned over 99% of its revenue from adult ads, a substantial percentage of which came directly from on-line prostitution and sex trafficking.[5]

10.      Salesforce, a technology company, is undisputedly one of America's greatest technology innovators, creating powerful and effective tools that have revolutionized business function and growth.

11.      In public, and on various social media platforms, Salesforce has boasted about fighting human trafficking. In reality, however, Salesforce created, owned, controlled, maintained, and provided the growth platform on which Backpage operated. This platform was provided and continued to be provided despite knowing the illicit and unlawful conduct Backpage was promoting. Simply, Salesforce supplied Backpage with the specialized tools, support, and technical expertise needed to operate and grow its on-line selling of sex and sex trafficking business including Jane Doe S.M.A. and others.

12.      Salesforce has operated beyond the law while fighting any and all efforts to hold them accountable for their wrongful conduct, even in the face of the extraordinary efforts required to address the public health crisis they helped create.

13.      While Backpage's role had become public knowledge, the role of its enablers like Salesforce has yet to be revealed.

14.      Technology companies can no longer divorce themselves from the technologies they create and platforms they control when they are being used in an unlawful, harmful, and costly manner.

---

[5]https://oag.ca.gov/system/files/attachments/press_releases/signed%20dec%20for%20arrest%20warrant%20pdf_Redacted.pdf (at *11).

15.     Technology companies should no longer escape liability for assisting, developing, and facilitating the growth of the unlawful selling of sex.

16.     This is not a case where Salesforce simply put a neutral product in someone's hands, or unwittingly provided electricity to Backpage's building, or delivered office supplies, or sold an off the shelf product, but is a case where Salesforce knowingly facilitated and directly assisted a known trafficker and pimping website to expand its operations.

### The Solution

17.     Technology companies have consistently tried to shield themselves from liability for their participation in the human trafficking crisis with the Communications Decency Act ("CDA"). The CDA was passed to protect children from online pornography and was never intended to protect technology companies from being held accountable for sex trafficking.

18.     Relatedly, the Trafficking Victims Protection Act (TVPRA) was enacted to extend liability for sex trafficking beyond the primary actors to others who knowingly benefited by facilitating sex trafficking.

19.     The criminal justice system has been bearing the cross in the fight against the selling of sex and sex trafficking for far too long by prosecuting the traffickers, prostitution promoters, and sex buyers.  It is now time for the civil justice system to hold those who profit from this sex trafficking and prostitution industry accountable for their wrongful conduct.

20.     For these reasons, and with great strength and courage, Plaintiff S.M.A. brings suit under the TVPRA.

### II.     JURISDICTION & VENUE

1.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the Trafficking Victims Protection Reauthorization Act

("TVPRA"), 18 U.S.C. § 1581, *et seq.*

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Backpage's principal place of business is in this District and Division and because a substantial part of the events or omissions giving rise to this claim occurred in this District and Division.

3.      The venture that trafficked Plaintiff S.M.A. was formed in this District and Division, the benefits related to Plaintiff S.M.A.'s trafficking were sent and received in this District and Division. Therefore, venue is proper in this Court.

## I.      THE PARTIES

4.      Plaintiff S.M.A. is a natural person who is a resident and citizen of Arizona.

5.      Salesforce is a foreign corporation organized under the laws of Delaware with its principal place of business in California. Salesforce may be served by delivering a summons to its registered agent, **C.T. Corporation System, 1999 Bryan St., Ste. 900, Dallas, Texas, 75201**, or by any other method authorized by law.

6.      All references to Salesforce include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority and implied/apparent authority), employee, person, firm, or corporation acting on behalf of Salesforce now or at any time relevant to the claims herein.

7.      Defendant Backpage.com, LLC ("Backpage") is a Delaware Limited Liability Corporation registered to do business and doing business in Texas, with its principal place of business located at 2501 Oak Lawn Ave., Dallas, Texas, 75219. Backpage may be served through **Carl Ferrer, Backpage CEO, at 8055 Windrose Ave, Apt. 3309, Plano, Texas 75024-0286.**

8.     Defendant Carl Ferrer, Backpage CEO, may be served through his attorney of record, **Mark Castillo, 901 Main Street, Suite 5500, Dallas, Texas 75202.**

9.     All references to Backpage includes any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority and implied/apparent authority), employee, person, firm, or corporation acting on behalf of Salesforce now or at any time relevant to the claims herein.

## II.    JURISDICTIONAL FACTS

10.     Salesforce is registered to do business in Texas and has been since at least 2005 and maintain(s)(ed) offices in Texas to facilitate its business operations.

11.     Salesforce has purposefully availed itself of the laws, benefits, and privileges of doing business in Texas since 2005.

12.     Salesforce operates and conducts business in Texas, which includes providing services and products to companies such as Backpage.

13.     Salesforce entered into multiple contracts with Backpage, a Texas company, in Dallas, Texas. The contracts cover products, services and on-site and remote support for a time period from November 2013 to April 2018.

14.     Contracts between Salesforce and Backpage were heavily negotiated and modified between legal counsel for Salesforce and Backpage.

15.     Salesforce directed said contracts to a "backpage.com" e-mail address.

16.     Salesforce employee(s), such as account executives, personally assigned to the Backpage account would routinely support, service, and provide tools to assist Backpage in running its business in Texas, from Salesforce's own Texas office.

17.     Salesforce placed Texas-based representatives on the Backpage account. Such representatives extended multiple invitations to meet for coffee, dinner, and drinks to Backpage employees and requested in-person meetings at Backpage's Texas office. These Texas based Salesforce employees also provided technical support to Backpage.

18.     Salesforce formed a venture with Backpage in Texas through entering into contracts signed by Backpage in Texas and providing continuous support for the products sold by Salesforce to grow and expand Backpage's online selling of sex, sex trafficking and promotion of prostitution operations out of their Texas office.

19.     Salesforce learned through its Texas contacts, that Backpage was operating a sext trafficking platform and promoting prostitution.

20.     Salesforce benefited from its ongoing and systematic business venture with Backpage in Texas by signing contracts with Backpage in Texas, sending invoices for its services and products sold to Backpage in Texas, and receiving payments from Backpage from Texas.

21.     Salesforce's venture with Backpage in Texas resulted and is related to Plaintiff S.M.A.'s trafficking on Backpage.

22.     The operative facts of this litigation concern whether or not Salesforce received a benefit from the participation in a venture that facilitated and/or promoted sex trafficking and prostitution. Therefore, there is a sufficient nexus such that specific personal jurisdiction is proper.

23.     Texas has an expectation and right to regulate companies who operate and do business in Texas to protect not only Texans, but the world from unlawful activity occurring within Texas.

24.     Texas has an interest in prohibiting the formation of trafficking ventures between Texas companies and companies who maintain minimum contacts within Texas.

25.     Texas has an interest in furthering fundamental social policies by discouraging Texas business relationships that benefit from and are the source of the promotion and facilitation of sex trafficking and across not only the nation but the world.

26.     Texas is a convenient and effective forum because Plaintiff was trafficked on Backpage, a Texas company, who Salesforce sold products and services that grew, promoted, and facilitated Backpage's growth in Texas through the Backpage website.

27.     The exercise of specific personal jurisdiction over Salesforce in Texas comports with the notions of fair play and substantial justice, as Salesforce has continuous Texas contacts directly related to its relationship with Backpage.

28.     The exercise of specific personal jurisdiction over Salesforce in Texas is consistent with the due process requirements of the Constitutions of both the United States and Texas.

29.     The exercise of specific personal jurisdiction over Salesforce in Texas is fair because Salesforce has continuous Texas contacts, has in the past and continues to conduct extensive business in Texas, and modern transportation and communications has made it much less burdensome for a party sued to defend itself in a State where he engages in significant economic activity.

30.     Salesforce has been named as a Defendant in Texas in multiple human trafficking lawsuits resulting from its facilitation of human trafficking through its venture with Backpage.

31.     Salesforce attempted, unsuccessfully, to remove two of the previous filed lawsuits to Federal Court, which were ultimately remanded back to Texas state court.

32.     Once the cases were remanded back to Texas state court, Salesforce sought affirmative relief from Texas courts related to claims similar to those brought herein. By seeking affirmative relief related to the similar claims, Salesforce has availed itself of the privileges and

benefits of Texas law, specifically as it related to claims for human trafficking in Texas, such as the claims brought by Plaintiff S.M.A.

33.     For these reasons, specific personal jurisdiction over Salesforce is proper.

## I.     FACTS REGARDING BACKPAGE AND SALESFORCE

**A.     Sex trafficking hits epidemic proportions in the United States as a direct result of the internet, specifically Backpage.**

34.     Estimates are that by 2016, there were as many as 40.3 million victims of human trafficking and sexual exploitation worldwide. Int'l Labour Office, *Global estimates of modern slavery:Forced labour and forced marriage*, at 9, 38,  https://www.ilo.org/wcmsp5/groups/public/---dgreports/-- dcomm/documents/publication/wcms_575479.pdf

35.     Historically, sex trafficking and prostitution took place out on the street. Now, most sex trafficking, including the trafficking of Jane Doe S.M.A., occurs online.

36.     With the development of modern technology, pimps and traffickers can reach entirely new audiences, evade law enforcement detection, and maintain control of victims by transporting them quickly between locations thus maximizing profits far beyond traditional trafficking methods.

37.     Backpage, as early as 2008, had been publicly identified by law enforcement, United States Attorneys General, and every United States Governor as the biggest and most notorious sex trafficking and prostitution promoting website in the United States.

38.     Backpage capitalized on Craigslist's decision to reduce sex ads on its platform, taking on the displaced ad volume for illegal sex from Craigslist.

39.     The National Association of Attorneys General described Backpage as a "hub" of "human trafficking, especially the trafficking of minors."[6]

---

[6] https://www.hsdl.org/?view&did=797979

40.     In 2013, Backpage did not have the ability to scale and operate an international sex-trafficking and sex-selling hub without operational support, marketing innovation, and guidance. Backpage sought a partnership that would assist the vision of its growth as the leader in online sex sales as well as concealing such activity including the moving of its operations offshore to evade law enforcement.

41.     In late 2013, Salesforce knowingly entered into business with Backpage and made possible the exponential growth of Backpage's business, sex trafficking and the selling of sex.  The relationship lasted until April 2018 when the Justice Department led the effort to seize Backpage.

42.     Salesforce will claim they were dealing with a Backpage affiliate and not with Backpage directly; however, at all relevant times, Salesforce knew it was working directly with Backpage through communications with Backpage executives and exchanging correspondence with Backpage at its business address and email addresses (@backpage.com) and taking money directly from Backpage.

43.     At all relevant times, Salesforce employees knew the nature of Backpage's business was sex trafficking and the promotion of prostitution.

44.     During all relevant times, Salesforce knew Backpage was in the business of selling sex through prostitution and the sex trafficking of minors and adults including Jane Doe S.M.A. Any examination of Backpage's internet operations and business needs or even a simple Google search would have established Backpage was in the business of the online selling of sex through compelled prostitution and the trafficking of persons.

45.     Salesforce's interactions with Backpage through its initial interviews, scope of work analyses, onboarding, integration, and continued support and control of the platform provided Salesforce with actual knowledge regarding the details of Backpage's operation.

**B.      Backpage and Salesforce knowingly participated and received a benefit from prostitution, the promotion of prostitution, and sex trafficking.**

46.      Salesforce created and owned the technology used by Backpage to grow and expand its internet based online selling of sex, sex trafficking, and compelled prostitution including the trafficking of Jane Doe S.M.A.

47.      In addition to creating and owning the technology, Salesforce maintained the platform Backpage operated from, offered ongoing support and consultation for Backpage to continue to operate and grow.

48.      The goods and services sold by Salesforce and purchased by Backpage were for Backpage use only. Salesforce did not host a platform or otherwise provide internet access or another public forum for the expression of public views, the exchange of marketable ideas, or any other publicly accessible purpose.

49.      Salesforce did not sell an off the shelf product, but rather sold a subscription program that granted access to its' technology, products, support, and service.

50.      The relationship between Salesforce and Backpage was far more expansive than the selling of a product. From inception, Salesforce, directly and/or through its agents, built Backpage's platform. Backpage could not (and did not) do it by itself.

51.      Salesforce sold Backpage access to several products and features including, but not limited to, Salesforce's premier level product - the Enterprise Edition - and Pardot - an advanced marketing technology.

52.      While Salesforce sold access, at all relevant times, Salesforce ultimately retained control, actively serviced the platform, and accessed Backpage's data. Salesforce performed these services as part of its continuous business relationship with Backpage.

53.      Backpage was unable to integrate and migrate its data without assistance.

54.     Rather than bringing in a third-party integrator, Salesforce personally assisted Backpage with the integration and migration of its data onto the Salesforce CRM technology platform.

55.      Salesforce provided Pardot, a marketing automation solution, to Backpage. Through its specialized algorithmic formula, Pardot creates "meaningful connections, generate more pipeline, and empower sales to close more deals."

56.     Salesforce knew from the outset that Backpage could not build out Pardot on its own, and as an incentive, provided and paid for implementation and build-out of Pardot for Backpage.

57.     By doing so, Salesforce actively furthered the venture that violated both State and Federal sex trafficking and prostitution laws.

58.     Salesforce retained ownership and control of the platform and technology utilized by Backpage to promote, develop, and grow its internet based online selling of sex, sex trafficking, and compelled prostitution including that of Jane Doe S.M.A.

59.     As set forth in the binding Master Service Agreements applicable to the time period Backpage was a customer, Salesforce retained the right to delete or restrict access to Backpage's data or platform if the actions or content of the user was found to be unlawful or tortious. Further, Salesforce retained complete ownership of its technology and products as specifically set forth in the contracts with Backpage.

60.     Additionally, the MSA or other applicable agreements required/allowed Salesforce to ensure its products were not being used for illegal purposes.

61.     To confirm compliance with the MSA, Salesforce must undertake to confirm its products are being used for legal purposes. Salesforce, therefore, looked at the business of Backpage.

62.     Salesforce provided access to unique technology tools and instruments to Backpage as part of its internet based online selling of sex, sex trafficking, and compelled prostitution including the trafficking of Jane Doe S.M.A.

63.     Salesforce provided ongoing operational support for the technology tools and instruments that made it possible for Backpage to engage in internet based on-line selling of sex, sex trafficking, and compelled prostitution including the trafficking of Jane Doe S.M.A.

64.     Backpage used Salesforce's technology to both facilitate and promote the selling of sex and sex trafficking.

65.     As pleaded above, Salesforce knew Backpage used its technology to promote and facilitate the selling of sex and sex trafficking. Thus, Salesforce, by accepting funds from Backpage, economically benefitted from the trafficking of Jane Doe S.M.A. and the thousands of other trafficking victims Backpage exploited.

66.     During initial negotiations on or about November 6, 2013, a Certified Salesforce Consulting Partner met with Backpage CEO Carl Ferrer and another high-level Backpage executive for introductions and to assess and evaluate Backpage's needs and goals. The Consulting Partner reported back to a Salesforce executive in an e-mail on November 7, 2013, that he "spent most of the time learning of [Backpage] as a business," noting the need for security and advanced integration.

67.     At all material times during the inception of the relationship between Salesforce and Backpage, Salesforce understood that it would be providing tools and services to Backpage,

who was operating the website www.backpage.com. Salesforce communicated directly with Backpage executives at its business address and email address (@backpage.com).

68.     On or about November 12, 2013, an in-house Salesforce Account Executive confirmed ongoing conversations with the Backpage executives and was confident that the partnership would soon be consummated stating "I think this is trending strongly in our favor."

69.     From inception, Salesforce inherently understood that the need for security was tantamount and met this need by providing the tools necessary for Backpage to evade legal and regulatory authorities during the period Jane Doe S.M.A. was trafficked. This independent action of Salesforce constitutes the facilitation and promotion of prostitution and the facilitation of sex trafficking.

70.     In addition to providing the tools necessary to carry out Backpage's plan to escape liability, Salesforce provided specialized skills and services because Backpage could not (and did not) use the tools without the assistance of Salesforce. In fact, Backpage's needs were so specific that Salesforce negotiated, assisted, and arranged for Backpage to be able to move its operations overseas.

71.     Backpage boasted of its relationship with Salesforce to investors, including in a presentation in 2014 that was contained in the Senate Subcommittee's Appendix to its report on Backpage, dated January 9, 2017:[7]

---

[7] https://www.hsgac.senate.gov/imo/media/doc/Final%20Appendix%202017.01.09.pdf, at pg. 739.

> - Revenue growth is a combination of increased customers, transactions, and judicial rate increases.
> - Rate increases are carefully implemented and incremental. Example, increasing a cost to post from $3 to $5. Rate increases are done to increase content quality (duplicate postings become too costly)
> - 2014 has been a year for us to invest in the hardware, staff, and technology to support the larger volume of content and improve the UX experience.
> Examples: Added a data center in Amsterdam, improved the ad postings architecture to support more volume,  added more banks and processing choices, improved our payment service provider technology, added SalesForce, migrated to a 3rd party solution to send transactional and marketing email.

72.    Each time a new application was purchased, support requested, or contract renewed, Backpage consulted with Salesforce to assess its operational needs. This occurred, at a minimum, on the following dates:  November 12, 2013; November 16, 2016; December 13, 2016; January 28, 2017; and April 27, 2017.

73.    At any one of those dates, Salesforce, as the owner with retained control over the platform, had the ability to literally pull the plug on Backpage's prostitution and sex trafficking operations.

74.    In e-mail correspondence, an in-house Salesforce executive confirmed that Backpage's needs would be best served by Salesforce's Enterprise CRM edition. As described on its website, the Enterprise edition is "fully customizable," providing a "deeply customizable sales CRM for [Backpage]'s business" of prostitution and sex trafficking.

75.    By promoting the selling of sex and sex trafficking, Backpage made its money directly from traffickers and the sellers of sex.  Backpage used that money to continue its purchases and subscriptions with Salesforce.

76.    Through the use of Salesforce's tools and instruments, Backpage's business exponentially grew requiring the scope of work covered by the Salesforce contract to grow as well with the purchasing of additional licenses, data storage, and other Salesforce features.

77.     At all relevant times, Salesforce knew it was working directly with Backpage through communications with Backpage executives and exchanging correspondence with Backpage at its address and email addresses.

78.     At all relevant times, Salesforce retained ownership, management, and ultimate control over Backpage's platform and data.

79.     Salesforce provided Backpage with personalized services tailored to the needs of its illegal business. Salesforce knowingly assisted, supported, and facilitated the system reorganization and provided the technical infrastructure for Backpage to move and operate its business overseas. Salesforce addressed a unique need in Backpage's business by creating a duplicate copy of Backpage's system and in doing so directly assisted Backpage in evading law enforcement scrutiny in the United States.  Such tailored services were not "generic" or "off the shelf."

80.     From inception, Salesforce had actual knowledge of the nature of Backpage.com and the company's need to conceal its internal business operations from public scrutiny. As just explained, Salesforce affirmatively assisted, supported, and facilitated Backpage in moving a duplicate copy of its system overseas for the purpose of evading law enforcement scrutiny. Because Salesforce's services and support are personalized to the needs of each business, Salesforce could not (and did not) have provided effective assistance to Backpage without understanding the needs of its business. Salesforce knew that the software and support it provided directly to Backpage was directly advancing the sex trafficking of adults and minors. Although Salesforce was in a position to learn, and did learn, about Backpage's illegal sex trafficking business, Salesforce nonetheless chose to financially benefit by facilitating sex trafficking through Backpage.

81.     In 2015, Backpage was under intense public scrutiny surrounding the credit card companies' refusal to process their transactions due to the nature of Backpage's business. Backpage was in fear of imminent law enforcement seizure necessitating the need for a duplicate copy of the Backpage system for use overseas.

82.     Salesforce's ongoing and continuous relationship with Backpage spanned several nationwide law enforcement efforts, multiple civil lawsuits against Backpage, and a U.S. Senate investigation.

83.     After Backpage's income decreased due to the absence of seamless credit card processing, Salesforce agreed to alter Backpage's payment structure in an attempt to help them stay afloat as they searched for solutions.

84.     At all relevant times, Salesforce knew it was participating in and benefitting from a sex trafficking venture and from the promotion of prostitution. For example, Backpage's CEO, Carl Ferrer, was arrested in Texas on October 6, 2016, for pimping underage children.[8] A month later, on November 17, 2016, Salesforce renewed its contract with Backpage, with Carl Ferrer signing the agreement.

85.     Carl Ferrer and Backpage later both entered into plea agreements with the Department of Justice, admitting that Backpage operated as a site for the sale of illegal sex.

86.     Salesforce's relationship with Backpage ended on April 13, 2018, only after the U.S. Department of Justice seized Backpage.

87.     Salesforce thus maintained a relationship with Backpage under circumstances and during a time period in which it is undisputed that Backpage was a venture engaged in human trafficking. Salesforce affirmatively, actively, and continuously aided, encouraged, and contributed

---

[8] https://oag.ca.gov/news/press-releases/attorney-general-kamala-d-harris-announces-criminal-charges-against-senior

to the success of the Backpage.com trafficking venture, knowing that its software and support facilitated trafficking on Backpage.

**C.     Jane Doe S.M.A. is compelled into prostitution and trafficked on Backpage during its relationship with Salesforce.**

88.     Beginning in 2013 through 2017, Jane Doe S.M.A. was sold for sex acts by force, fraud, or coercion by the individual trafficker in Arizona and trafficked and facilitated by the Defendants in Dallas, Texas.

89.     The compelled prostitution and trafficking of Jane Doe S.M.A. was made possible by the technology tools, operational support, and platform provided by Backpage and Salesforce.

90.     Jane Doe S.M.A.'s trafficker paid money to Backpage to post ads selling Jane Doe S.M.A. for sex.

91.     Jane Doe S.M.A. was caused by any means into prostitution and sex trafficking by the acts of Backpage and Salesforce both jointly and independently.

92.     Jane Doe S.M.A. suffered significant physical and emotional injuries as a result of the trafficking and/or compelled prostitution complained of herein.

### III.     CAUSES OF ACTION

**A.     CAUSES OF ACTION AGAINST SALESFORCE**

93.     During the period that Plaintiff S.M.A. was trafficked by and through Backpage, Salesforce was the sole provider, customizer, owner, manager and operator of the platform and technology that allowed Backpage to promote the trafficking prostitution of others including Plaintiff S.M.A.

94.     Plaintiff S.M.A. seeks to hold Salesforce accountable for its own, independent actions in the promotion of and benefit from prostitution and trafficking of persons including Plaintiff S.M.A.

18

95.     Plaintiff S.M.A. does not, in any way, seek to treat Salesforce as a publisher or speaker. Rather she is pursuing state law claims against Salesforce that do not implicate the Communications Decency Act, 47 U.S.C. § 230(c)(1).

### FIRST CAUSE OF ACTION—SEX TRAFFICKING PURSUANT TO TVPRA

96.     Plaintiff S.M.A. incorporates all other allegations as if set forth in full herein.

97.     At all relevant times, Plaintiff S.M.A. was and is a victim within the meaning of 18 U.S.C. § 1595(a).

98.     Salesforce benefitted from the products and assistance it provided to Backpage, which Salesforce knew or should have known was facilitating sex trafficking. Salesforce benefitted both in the way of direct fees from Backpage as well as from the collection and exchange of user data from visitors to backpage.com.

99.     More specifically, Salesforce knowingly assisted, supported and facilitated sex trafficking by, at a minimum, enabling Backpage to conduct the following:

   a.  Gathering and managing information from traffickers' and pimps' public social media activity, including but not limited to their likes and dislikes and what they are saying and sharing about Backpage and its competitors;

   b.  Developing an infrastructure for a trafficker and pimp database, as well as tracking and collecting trafficker and john data across multiple platforms including phone, email, websites and social media;

   c.  Collecting traffickers' and pimps' data across multiple sources and channels and using this information to promote Backpage and the use of its services;

   d.  Automatically generating insights into traffickers' and pimps' purchasing habits to help Backpage understand the traffickers better and predicting how they will feel and act so Backpage could prepare the most effective outreach;

   e.  Collecting information of sex traffickers and victims to target through direct e-mail campaigns to advertise and promote illegal prostitution;

   f.  Analyzing information and behavior of pimps and victims to target through direct e-mail campaigns to advertise and promote illegal prostitution;

19

g. Utilization of cloud storage to store (and secure) operational database and information;

h. Implementing a significant payment processing interface capability allowing Backpage to connect with credit card companies and integrating payment information with information about pimps and traffickers;

i. Improving the solicitation of sales opportunities to traffickers and pimps for Backpage;

j. Improving and implementing the solicitation of referrals from existing traffickers and pimps using Backpage by creating cross-selling and upselling opportunities;

k. Duplication of operating system to evade law enforcement in or around 2015; and

l. System modification to enable operation from three continents.

**B.    CAUSES OF ACTION AGAINST BACKPAGE DEFENDANTS**

**FIRST CAUSE OF ACTION—SEX TRAFFICKING PURSUANT TO TVPRA**

100.    Plaintiff S.M.A. incorporates all other allegations as if set forth in full herein.

101.    At all relevant times, Plaintiff S.M.A. was and is a victim within the meaning of 18 U.S.C. U.S.C. § 1595(a).

102.    Backpage directly facilitated sex trafficking through the posting of advertisements for sex trafficking, in addition the following non-exclusive acts:

a. Providing a forum for Plaintiff S.M.A.'s trafficker to post her for trafficking;

b. Failing to stop online posting of Plaintiff S.M.A. and other human or sex trafficking victims;

c. Accepting advertising fees from www.backpage.com from human traffickers, including Plaintiff S.M.A.'s trafficker, despite actual and/or constructive knowledge that those advertisements were for illegal activities, such as, but not limited to human trafficking, prostitution, and/or sexual exploitation of victims;

d. Designing and implementing The Strip Term from Ad Filter to automatically sanitize advertisements intended to promote human trafficking, prostitution, and/or the sexual exploitation of victims in an effort to maximize advertising revenue, customer satisfaction and avoid law enforcement detection of illegal acts;

e. Designing and implementing, in order to maximize revenue, a manual moderation system intended to sanitize posted content advertising human trafficking,

prostitution, and/or the sexual exploitation of victims to give those ads the appearance of promoting legal escort services as opposed to illegal services;

f.   Implementing a corporate policy to maximize revenue of sanitizing advertisements promoting human trafficking, prostitution, and/or sexual exploitation of victims instead of removing those advertisements from Backpage or reporting those advertisements to the proper law enforcement officers;

g.   Knowingly implementing a corporate policy in order to maximize profit from the adult section of Backpage.com that discouraged moderators and employees of Backpage from contacting the authorities and/or advocacy groups when advertisements on Backpage.com clearly promoted human trafficking, prostitution, and/or sexual exploitation of victims;

h.   Knowingly refusing to pull down advertisements (after Backpage had internally sanitized the ad either manually or with the use of the Strip Term from Ad Filter) that clearly demonstrated victims were being exploited and trafficked for sex; and

i.   Knowingly refusing to pull down advertisements after reports and/or complaints that the advertisement was being used to exploit a victim.

103.   Backpage directly benefited from the posting of advertisements for sex trafficking.

104.   Backpage's TVPRA violations were a direct, producing, and proximate cause of the injuries and damages to Plaintiff S.M.A.

## IV.   DAMAGES

105.   Salesforce and Backpage's acts and omissions, individually and collectively, caused Plaintiff S.M.A. to sustain legal damages.

106.   Plaintiff S.M.A. is entitled to be compensated for personal injuries and economic damages, including:

a.   Actual damages;

b.   Direct damages;

c.   Incidental and consequential damages;

d.   Mental anguish and emotional distress damages (until trial and in the future);

e.   Restitution;

    f.  Unjust enrichment; and

    g.  Penalties.

107. Plaintiff S.M.A. is entitled to exemplary damages by statute.

108. Plaintiff S.M.A. is entitled to treble damages.

109. Plaintiff S.M.A. is entitled to recover attorneys' fees and costs of court.

110. Plaintiff S.M.A. is entitled to pre- and post-judgment interest at the maximum legal rates.

111. A constructive trust should be imposed on Backpage and Salesforce and the Court should sequester any benefits or money wrongfully received by Backpage and Salesforce for the benefit of Plaintiff S.M.A.

## V. JURY TRIAL

112. Plaintiff S.M.A. demands a jury trial on all issues.

## VI. RELIEF SOUGHT

113. Wherefore, Plaintiff S.M.A. respectfully requests judgment against the Defendants for actual damages in excess of the minimum jurisdictional limits of this Court, pre- and post-judgment interest as allowed by law, costs of suit, attorney fees and all other relief, at law or in equity, to which she may be justly entitled.

Respectfully submitted,

ANNIE MCADAMS PC

By: /s/ *Annie McAdams*
       ANNIE MCADAMS, PC
       Annie McAdams
       State Bar No. 24051014
       S.D. Tex. No. 1514589
       1150 Bissonnet
       Houston, Texas 77005
       Telephone: (713) 785-6262
       Facsimile: (866) 713-6141
       teamamc@mcadamspc.com

       and

By: /s/ *David E. Harris*
       SICO HOELSCHER HARRIS LLP
       David E. Harris
       State Bar No. 24049273
       S.D. Tex. No. 712461
       802 N. Carancahua, Ste. 900
       Morgan A, Malouf
       State Bar No. 24127767
       S.D. Tex. No. 380522
       Corpus Christi, Texas 78401
       Telephone: (361) 653-3300
       Facsimile: (361) 653-3333
       dharris@shhlaw.com
       harrisht@shhlaw.com
       and
       THE GALLAGHER LAW FIRM
       Michael T. Gallagher
       State Bar No. 07586000
       S.D. Tex. No. 5395
       Pamela McLemore
       State Bar No. 24099711
       2905 Sackett Street
       Houston, Texas 77098
       Telephone: (713) 222-8080
       Facsimile: (713) 222-0066
       mike@gld-law.com
       pamm@gld-law.com

       **ATTORNEYS FOR PLAINTIFF**