UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JANE DOE (S.M.A.),[1] | § | |
| | § | |
|    Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:23-CV-0915-B |
| | § | |
| SALESFORCE, INC., | § | |
| BACKPAGE.COM, LLC, and CARL | § | |
| FERRER, | § | |
| | § | |
|    Defendants. | § | |

<u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is Defendant Salesforce, Inc.'s ("Salesforce") Motion to Dismiss (Doc. 25). For the reasons stated below, the Court **GRANTS** the Motion and **DISMISSES** Plaintiffs' claims against Salesforce **WITHOUT PREJUDICE**.

I.

BACKGROUND

Plaintiffs are sex-trafficking victims. Doc. 30, Resp., 1. Plaintiffs claim that their individual traffickers advertised and sold them for sex on Defendant Backpage.com, LLC's ("Backpage") online platform. *Id.* They further claim that Salesforce provided Backpage with the technology and services needed to expand Backpage's illicit business and evade detection from law enforcement. *Id.* Plaintiffs bring a cause of action under § 1595(a) of the Trafficking Victims Protection

---

[1] On June 20, 2023, the Court consolidated the following cases: 3:23-cv-915, 3:23-cv-918, 3:23-cv-919, 3:23-cv-920, 3:23-cv-921, 3:23-cv-923, 3:23-cv-924, 3:23-cv-925, 3:23-cv-927, 3:23-cv-928, 3:23-cv-929, 3:23-cv-930, 3:23-cv-931, 3:23-cv-933,3:23-cv-935, 3:23-cv-936, 3:23-cv-937, 3:23-cv-939, 3:23-cv-940, 3:23-cv-941, 3:23-cv-943, 3:23-cv-944, 3:23-cv-1322, 3:23-cv-1324, and 3:23-cv-1325. See Doc. 23, Mem. Op. & Order, 5–6. This case was designated as the lead case. *Id.* at 6.

Reauthorization Act ("TVPRA") against Backpage and its former CEO, Carl Ferrer, and Salesforce (collectively "Defendants") for their role in Plaintiffs' trafficking. *Id.*

Backpage was an online marketplace used by sex traffickers to advertise and sell individuals, including Plaintiffs, for sex acts. Doc. 1, Compl., ¶¶ 6, 37–39. From 2013 to 2015, "Backpage earned over 99% of its revenue from adult ads, a substantial percentage of which came directly from on-line prostitution and sex trafficking." *Id.* ¶ 9. Specifically, sex traffickers used Backpage to "post" particular victims for sale, which enabled traffickers to "reach entirely new audiences[] [and] evade law enforcement." *Id.* ¶¶ 36, 90, 102. Since 2008, "Backpage . . . had been publicly identified by law enforcement, [the] United States Attorneys General, and every United States Governor as the biggest and most notorious sex trafficking and prostitution promoting website in the United States." *Id.* ¶ 37.

In 2013, Backpage had difficulty scaling its operations "without operational support, marketing innovation, and guidance." *Id.* ¶ 40. Backpage thus sought out a partner that could "assist the vision of its growth as the leader in online sex sales as well as concealing such activity including the moving of its operations offshore to evade law enforcement." *Id.* Backpage allegedly found such a partner in Salesforce. *Id.* ¶ 41. Salesforce is a Delaware technology company that maintains its principal place of business in California. *Id.* ¶ 5. Salesforce sells cloud-based customer relationship management ("CRM") software subscriptions to businesses throughout the United States; Salesforce's CRM software enables businesses "to input and manage their customer relationship data and use that data for sales, service, support, and marketing purposes." Doc. 26, Mot. Dismiss Br., 5; *see* Doc. 1, Compl., ¶ 99.

From 2013 to 2018, Salesforce and Backpage entered into a series of contracts in Texas, which allegedly "made possible the exponential growth of Backpage's business, sex trafficking and

the selling of sex." *Id.* ¶ 41. Pursuant to those contracts, Salesforce assigned employees from its Texas-based office to "support, service, and provide tools to assist Backpage in running its business in Texas, from Salesforce's own Texas office." *Id.* ¶ 16. Specifically, Salesforce's Texas-based representatives allegedly worked with Backpage to build out Backpage's CRM software in order "to promote, develop, and grow its internet based online selling of sex, sex trafficking, and compelled prostitution." *Id.* ¶ 58. Plaintiffs further allege that "Salesforce personally assisted Backpage with the integration and migration of its data onto the Salesforce CRM technology platform." *Id.* ¶ 54. Although the platform was created for Backpage's benefit, "Salesforce ultimately retained control, actively serviced the platform, and accessed Backpage's data." *Id.* ¶ 52. Aside from the CRM platform, Salesforce also provided Backpage with access to Pardot, "a marketing automation solution," which employs a "specialized algorithmic formula, [and] creates meaningful connections, generate more pipeline, and empower sales to close more deals." *Id.* ¶ 55. Salesforce allegedly "provided and paid for implementation and build-out of Pardot for Backpage." *Id.* ¶ 56.

Plaintiffs claim that they were trafficked through Backpage with the help of Salesforce's technology and services. According to Plaintiffs, Backpage used Salesforce's software to analyze "traffickers' and pimps' data across multiple sources and channels," in order "to help Backpage understand the traffickers better and predict[] how they will feel and act so Backpage could prepare the most effective outreach." *Id.* ¶ 99. In turn, Backpage used this information to generate targeted "campaigns to advertise and promote illegal prostitution." *Id.* Thus, when "trafficker[s] paid money to Backpage to post ads selling" Plaintiffs for sex, Backpage utilized Salesforce's software to target those ads to specific consumers, which allegedly facilitated Plaintiffs' trafficking. *Id.* ¶ 90.

Lead Plaintiff S.M.A. initiated the present litigation against Defendants on May 1, 2023. *See generally id.* Lead Plaintiff asserts a claim under 18 U.S.C. § 1595 against each Defendant. *See*

*id.* As pertinent to the present Order, Lead Plaintiff claims that Salesforce is liable under § 1595(a) because it knowingly benefited from its participation in a venture with Backpage that violated sex trafficking laws as to her. *Id.* ¶¶ 96–99. Lead Plaintiff further alleges that Salesforce knew or should have known that this venture engaged in violations of 18 U.S.C. § 1591. *Id.* On June 20, 2023, the Court consolidated Lead Plaintiff's case with over twenty substantially similar cases. Doc. 23, Mem. Op & Order.

On June 30, 2023, Salesforce filed the Motion to Dismiss (Doc. 25) presently before the Court. Salesforce argues that this case should be dismissed for three reasons. Doc. 26, Mot. Dismiss Br., 2–5. First, Salesforce argues that certain claims should be dismissed under Rule 12(b)(2) for lack of personal jurisdiction.[2] *Id.* at 2. Second, Salesforce argues this case should be dismissed because Plaintiffs' claims cannot proceed under the Communications Decency Act ("CDA"). *Id.* at 2–3. Third, Salesforce argues that this case should be dismissed under Rule 12(b)(6) because Plaintiffs have failed to state a plausible claim for relief. *Id.* at 3–5. Salesforce's Motion is fully briefed and ripe for review. The Court considers it below.

## II.

## LEGAL STANDARDS

A.   *Personal Jurisdiction*

Under Rule 12(b)(2), a defendant may move to dismiss an action for lack of personal jurisdiction. When the defendant so moves, it is the plaintiff's burden to establish that personal jurisdiction is proper. *Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429, 431 (5th Cir. 2014). "To satisfy that burden, the party seeking to invoke the court's jurisdiction must 'present sufficient facts

---

[2] Salesforce only argues that the Court lacks personal jurisdiction over it as to the claims asserted by Plaintiffs who are neither residents of Texas nor trafficked in Texas. Doc. 26, Mot. Dismiss Br., 2.

as to make out only a *prima facie* case supporting jurisdiction,' if a court rules on a motion without an evidentiary hearing" *Nunes v. NBCUniversal Media, LLC*, 582 F. Supp. 3d 387, 394 (E.D. Tex. 2022) (quoting *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000)). The Court considers "affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery" and resolves any factual conflict contained in the parties' submissions in the plaintiff's favor. *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985); *Cent. Freight Lines, Inc. v. APA Transp. Corp.*, 322 F.3d 376, 380 (5th Cir. 2003).

A district court's exercise of personal jurisdiction is only proper if "(1) the forum state's long-arm statute confers personal jurisdiction over [the] defendant; and (2) the exercise of personal jurisdiction comports with the Due Process Clause of the Fourteenth Amendment." *E. Concrete Materials, Inc. v. ACE Am. Ins. Co.*, 948 F.3d 289, 296 (5th Cir. 2020) (citations omitted); *see Trois v. Apple Tree Auction Ctr., Inc.*, 882 F.3d 485, 488 (5th Cir. 2018). Here, Texas's long-arm statute authorizes the exercise of personal jurisdiction to the full extent permitted by the Due Process Clause. *Id.* As such, "the two-step inquiry collapses into one federal due process analysis." *Sangha v. Navig8 ShipManagement Priv. Ltd.*, 882 F.3d 96, 101 (5th Cir. 2018).

The federal Due Process analysis is twofold. First, the nonresident defendant must have purposefully availed itself of the benefits and protections of the forum state through "minimum contacts" such that it should reasonably anticipate being haled into court there. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–75 (1985). Second, the exercise of jurisdiction over the defendant must "not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted).

B.       *12(b)(6) Pleading Standard*

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 12(b)(6) authorizes dismissal of a plaintiff's complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). In considering a Rule 12(b)(6) motion to dismiss, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (citation omitted). But the court will "not look beyond the face of the pleadings to determine whether relief should be granted based on the alleged facts." *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999).

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). When well-pleaded facts fail to meet this standard, "the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (internal quotations and alterations omitted).

## III.

## ANALYSIS

As detailed more fully below, the Court concludes that Salesforce is entitled to dismissal. While Salesforce is subject to personal jurisdiction in this forum and is not entitled to immunity

under the CDA, Plaintiffs have failed to state a claim under 18 U.S.C. § 1595(a). Specifically, Plaintiffs did not plausibly allege that Salesforce had constructive knowledge that the venture in which it is alleged to have participated engaged in the 18 U.S.C. § 1591(a) violations sued upon. The Court therefore dismisses Plaintiffs' § 1595(a) claims against Salesforce without prejudice to allow Plaintiffs an opportunity to cure the pleading deficiency identified in this Order.

A.      *Personal Jurisdiction*

The Court concludes it possesses personal jurisdiction over Salesforce. Plaintiffs have established that Salesforce has minimum contacts with Texas and that their claims arise out of those contacts. Having made such a showing, the burden shifted to Salesforce to establish that the exercise of personal jurisdiction offends traditional notions of fair play and substantial justice. Salesforce has failed to carry this burden.

There are two types of personal jurisdiction: general and specific. *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 137 S. Ct. 1773, 1780 (2017). The difference between the two is the scope of claims that may be brought against a defendant in a given forum. *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *Daimler AG v. Bauman*, 571 U.S. 117, 138 (2014). General jurisdiction allows a court in the forum state to hear any and all claims against a defendant. *Bristol-Myers Squibb*, 137 S. Ct. at 1780. It is only available in those cases where a defendant's contacts with the forum state "are so continuous and systematic" as to render the defendant at home in the forum state. *See Goodyear*, 564 U.S. at 919. Where general jurisdiction is unavailable, a court may only hear a claim against a defendant if the plaintiff establishes that specific jurisdiction exists. *See Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358–59 (2021). However, specific jurisdiction only permits adjudication of those claims arising out of or relating to the defendant's contacts in the forum state. *Bristol-Myers Squibb*, 137 S. Ct. at 1780. In

short, if a defendant is at home in the forum, the court possesses general jurisdiction over the defendant and may adjudicate any type of claim against that defendant; if the defendant is not at home in the forum, a court *might* possess specific jurisdiction over the defendant, in which case the court could only adjudicate claims against the defendant that arise out of or relate to the defendant's forum contacts. *Ford Motor Co.*, 592 U.S. at 358–59.

The parties agree that Salesforce is not subject to general jurisdiction in Texas. *See* Doc. 26, Mot. Dismiss Br., 9; Doc. 30, Resp., 6–7. Salesforce is incorporated in Delaware with its principal place of business in California. Doc. 1, Compl., ¶ 5; Doc. 26, Mot. Dismiss Br., 9. Salesforce is thus not at home in Texas, and the Court may not exercise general personal jurisdiction over it. *See Daimler*, 571 U.S. at 137 ("With respect to a corporation, the place of incorporation and principal place of business are paradigm bases for general jurisdiction." (citation and alteration omitted)). Accordingly, the issue here is whether the Court may properly exercise specific jurisdiction over Salesforce.

The Fifth Circuit employs a three-step analysis to determine whether a district court may properly exercise specific jurisdiction:

> (1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable.

*E. Concrete Materials, Inc.*, 948 F.3d at 296 (quoting *Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429, 433 (5th Cir. 2014)). If the plaintiff establishes the first two steps, "the burden shifts to the defendant to show that the exercise of personal jurisdiction would be unfair or unreasonable." *Id.* The Court addresses each step in turn below and finds that Salesforce is subject to personal jurisdiction on Plaintiffs' claims in Texas.

1.   <u>Minimum Contacts</u>

It is undisputed that Salesforce has sufficient minimum contacts. *See* Doc. 26, Mot. Dismiss Br., 10; Doc. 30, Resp., 7. Salesforce has been registered to do business in Texas since 2005, maintains offices in the state, and conducts a portion of its business operations here. *See* Doc. 1, Compl., ¶¶ 10, 12; Doc. 30, Resp., 7. Salesforce thus "purposefully avail[ed] itself of the privilege of conducting activities within the forum State[] . . . [and] invok[ed] the benefits and protections of its laws." *See Hanson v. Denckla*, 357 U.S. 235, 253 (1958). Accordingly, Plaintiffs have discharged their burden as to the first prong of the specific jurisdiction analysis. *See E. Concrete Materials, Inc.*, 948 F.3d at 296.

2.   <u>Relatedness</u>

Specific jurisdiction only exists if "the suit 'arises out of or relates to the defendant's contacts with the forum.'" *Daimler,* 571 U.S. at 127 (*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, n. 8 (1984)) (alterations omitted); *see also Clemens v. McNamee*, 615 F.3d 374, 378–79 (5th Cir. 2010) ("Specific jurisdiction . . . requires a sufficient nexus between the non-resident's contacts with the forum and the cause of action."). At this stage, the jurisdictional analysis centers on "the relationship among the defendant, the forum, and the litigation." *Georgiou v. Battery Junction Corp.*, 646 F. Supp. 3d 781, 792 (N.D. Tex. 2022) (O'Connor, J.) (citations omitted). "For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014); *see also Ford Motor Co.*, 592 U.S. at 359–60 ("[T]here must be an affiliation between the forum and the underlying controversy, principally an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." (alterations omitted) (quoting *Bristol-Meyers Squibb*, 137 S.Ct. at 1780)).

The relatedness requirement "derive[s] from and reflect[s]" the due process principle that defendants should be treated fairly. *Ford Motor Co.*, 592 U.S. at 360 (citing *World-Wide Volkswagen*, 444 U. S. at 293)). At a minimum, due process mandates "that individuals have 'fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 218, (1977) (Stevens, J., concurring)). "For this reason, 'specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction.'" *Bristol-Myers Squibb*, 137 S. Ct. at 1780 (quoting *Goodyear*, 564 U.S. at 919).

The Supreme Court has clarified that while a causal nexus between a defendant's forum contacts and the litigation is not necessary to sustain a court's exercise of personal jurisdiction, it is sufficient. *See Ford Motor Co.*, 592 U.S. at 362. That is, a plaintiff can—but is not required to—establish the relatedness prong of the analysis by demonstrating that its "claim came about because of the defendant's in-state conduct." *Id.*; *see also Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 780 (1984) ("[R]espondent is carrying on a part of its general business in [the forum state], and that is sufficient to support jurisdiction when the cause of action arises out of the very activity being conducted, in part, in [the forum state].").

Applying the foregoing principles here, the Court concludes that Plaintiffs' claims against Salesforce arise out of Salesforce's forum contacts because the conduct relevant to Plaintiffs' claims occurred entirely in Texas. *See Walden*, 571 U.S. at 291. Plaintiffs bring a cause of action against Salesforce under 18 U.S.C. § 1595(a), which imposes civil liability on perpetrators of sex trafficking and those who knowingly benefit from participating "in a venture which that person knew or should have known has engaged in" sex trafficking under 18 U.S.C. § 1591. Doc. 1, Compl., ¶¶ 93–99. At its simplest, Plaintiffs allege that Salesforce is liable because it participated in a venture

that violated § 1591 by providing software and services to Backpage. *See* Doc. 1, Compl., ¶ 18. And Salesforce's actions which Plaintiffs claim constitute participation occurred almost exclusively in Texas: (1) Salesforce allegedly entered into multiple contracts with Backpage in Texas; (2) Salesforce routinely supported, serviced, and assisted Backpage in running its business in Texas, from Salesforce's own Texas office; and (3) Salesforce placed Texas-based representatives on the Backpage account, who frequently met with and provided technical support to Backpage in Texas. *Id.* ¶¶ 16–18. In short, Salesforce was "carrying on a part of its general business in [Texas], and . . . [Plaintiffs'] cause of action arises out of the very activity being conducted, in part, in [Texas]." *Keeton,* 465 U.S. at 780. Moreover, it can hardly be said that Salesforce lacked fair notice that its work for Backpage could subject it to the jurisdiction of Texas's courts. *See Ford Motor Co.,* 592 U.S. at 360. Salesforce necessarily had fair warning that its commercial relationship with Backpage in Texas could give rise to litigation in this forum directly tied to that relationship.

Therefore, the Court concludes that Plaintiffs' claims arise out of Salesforce's forum contacts.

> ### 3. Fair Play and Substantial Justice

"The third prong of the personal jurisdiction test asks whether the exercise of jurisdiction in a particular case would be reasonable and just according to our traditional conception of fair play and substantial justice." *Dillard v. Fed. Corp.,* 321 F. Supp. 3d 752, 760 (W.D. Tex. 2018) (citation omitted). The Court considers the following elements in conducting this analysis:

> (1) the burden on the nonresident defendant of having to defend itself in the forum;
> (2) the interests of the forum state in the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in the most efficient resolution of controversies; and (5) the shared interests of the states in furthering fundamental social policies.

*Cent. Freight Lines Inc. v. APA Transp. Corp.*, 322 F.3d 376, 384 (5th Cir. 2003). Salesforce has the burden of "establish[ing] the unconstitutionality of [Texas's] assertion of jurisdiction" using these factors. *Burger King Corp*, 471 U.S. at 482; *see E. Concrete Materials, Inc.*, 948 F.3d at 298. Salesforce "must make a compelling case." *Cent. Freight Lines Inc. v. APA Transp. Corp.*, 322 F.3d 376, 384 (5th Cir. 2003)

The Court concludes that Salesforce has failed to discharge its heavy burden of demonstrating that it would be so unfair or unreasonable to subject it to litigation in Texas as to render jurisdiction here unconstitutional.[3]

### i.   Burden on Defendant

The first and "most important factor is the burden on the defendant." *E. Concrete Materials, Inc.*, 948 F.3d at 299. Among other things, "[a]ssessing this burden . . . requires a court to consider the practical problems resulting from litigating in the forum." *Bristol-Myers Squibb*, 582 U.S. at 263. Here, Salesforce fails to argue that it would be burdened by litigating this suit in Texas. As the burden is on Salesforce, the Court finds that the most important factor weighs in favor of jurisdiction.

### ii.   Forum State's Interest

As for the second factor, Salesforce must show that Texas has "*no legitimate* interest in holding [Salesforce] answerable on a claim related to the contacts [it] had established in that State." *Burger King Corp.*, 471 U.S. at 482–83 (citations and alterations omitted) (emphasis added).

---

[3] Another court in this district found that the exercise of personal jurisdiction would be unfair and unreasonable under identical facts. *See A.M. v. Salesforce.com, Inc.*, No. 3:21-CV-1668-L, 2022 WL 2181068, at *4 (N.D. Tex. June 16, 2022). While the Court appreciates the analysis contained therein, ultimately the decision is not binding authority. *See Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 428 (2011). For the reasons set forth in this Order, the Court reaches a different conclusion.

Because Salesforce cannot demonstrate that Texas lacks a legitimate interest in the controversy, the Court concludes that this factor also weighs in favor of exercising of personal jurisdiction.

Texas has an interest in prohibiting the formation and operation of sex trafficking ventures within its borders. In *Keeton v. Hustler Magazine*, a libel case, the Supreme Court explained that "[a] state has an especial interest in exercising judicial jurisdiction over those who commit torts within its territory." 465 U.S. at 776 (citations omitted). "This is because torts involve wrongful conduct which a state seeks to deter, and against which it attempts to afford protection, by providing that a tortfeasor shall be liable for damages which are the proximate result of his tort." *Id.* (citations omitted). Texas's interest in adjudicating § 1595(a) cases in its own courts can be likened to its interest in exercising jurisdiction over tortfeasors in the state. That is, Texas has an interest in "exercising judicial jurisdiction over those who," within its borders, participate in ventures that in engage in sex trafficking because such participation involves "wrongful conduct which [Texas] seeks to deter, and against which it attempts to afford protection." *See id.*

Salesforce concedes as much but argues that Texas's interest "fall[s] away" in cases "where neither the plaintiff nor defendant is a forum resident, and where the relevant conduct and harms did not occur" in Texas. Doc. 26, Mot. Dismiss Br., 11. The Court is not persuaded. To be sure, the residency of the parties and the place of the ultimate injury are relevant considerations when considering a state's interest. *See Dillard*, 321 F. Supp. 3d at 761. But these considerations are not invariably determinative. *See E. Concrete Materials, Inc.*, 948 F.3d at 299. This is because Texas, like every state, also has an interest in ensuring that businesses which operate within its borders conduct their operations consistently with the law. Therefore, the Court determines that the second factor likewise weighs in favor of exercising jurisdiction.

###### iii.   *Plaintiffs' Interest*

The third factor is the Plaintiffs' interest in obtaining convenient and effective relief. Salesforce argues that "the most convenient forum for each of these Plaintiffs would be either their home states or where the alleged trafficking occurred." Doc. 26, Mot. Dismiss Br., 12. The Court disagrees. These states would not be a convenient forum for Plaintiffs because little evidence relevant to Plaintiffs claims against *Salesforce* would be located in those states. *See Thompson v. Chrysler Motors Corp.*, 755 F.2d 1162, 1173 (5th Cir. 1985). While Plaintiffs allege that they were forced to engage in commercial sex acts across the country, they claim that Salesforce is liable for participating in a venture that committed in a distinct sex-trafficking offense—advertising the Plaintiffs. Doc. 1, Compl., ¶¶ 93–99. And for this claim, the pertinent evidence will be in Texas because this is where Salesforce is alleged to have incurred liability under § 1595. For example, likely witnesses in this case will be Salesforce's Texas-based employees. *See generally id*. It would be far more efficient and convenient for Plaintiffs to call such witnesses in a Texas court than it would be to have each witness travel to each state in which a particular plaintiff was trafficked or is a resident. *See Thompson*, 755 F.2d at 1173.

###### iv.   *Judicial System's Interest & Shared Interest*

Finally, the Court concludes that neither fourth nor fifth factors suggests that personal jurisdiction is unconstitutional. The fourth factor, the interstate judicial system's interest in the efficient administration of justice, weighs in favor of jurisdiction in Texas because the most efficient way to resolve the present controversy would be adjudicate this dispute in the forum where the relevant conduct occurred and evidence exists—here that is Texas.  As for the fifth factor—the shared interests of the states in furthering fundamental social policies—the Court concludes that

fundamental social policies are advanced by allowing alleged victims of sex-trafficking to sue in the forum of their choosing.

***

In sum, all reasonableness factors weigh in favor of personal jurisdiction. Therefore, the Court concludes that it possesses specific personal jurisdiction over Salesforce.

Plaintiffs have shown that Salesforce purposefully availed itself of the law and privileges of Texas and that their claims against Salesforce arise out of these forum contacts. Further, Salesforce has not shown that other considerations of fairness make this Court's exercise of jurisdiction unconstitutional. Accordingly, Salesforce's Motion to Dismiss for lack of personal jurisdiction is **DENIED**.

B.      *Communications Decency Act*

Salesforce also argues that Plaintiffs' claims cannot proceed under the CDA. The Court disagrees because Plaintiffs' claims do not treat Salesforce as a publisher or speaker of third-party content. As such, the CDA affords Salesforce no immunity here.

Section 230 of the CDA provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). As the Fifth Circuit has explained, the CDA "creates federal immunity to any cause of action that would make internet service providers liable for information originating with a third-party user of the service." *Diez v. Google, Inc.*, 831 F. App'x 723, 724 (5th Cir. 2020) (per curiam). In enacting the CDA, Congress sought "to promote the free exchange of information and ideas over the Internet and to encourage voluntary monitoring for offensive or obscene material." *Prickett v. InfoUSA, Inc.*, 561 F. Supp. 2d 646, 650 (E.D. Tex. 2006) (citing *Carafano v. Metrosplash.com., Inc.*, 339 F.3d 1119, 1122 (9th Cir. 2003)).   Accordingly,

courts have construed the CDA's grant of immunity broadly in "cases arising from the publication of user-generated content." *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008).

To fall within the purview of the CDA's immunity, a defendant must demonstrate (1) that it is a provider of an interactive computer service and (2) that it will be treated as the publisher or speaker of third-party content for purposes of a plaintiff's claims. *See* 47 U.S.C. § 230(c)(1); *see also La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 993 (S.D. Tex. 2017). The Court need not decide whether Salesforce is a provider of an interactive computer service because it concludes that Plaintiffs' claims do not treat Salesforce as a publisher of third-party content.

"At its core, § 230 bars 'lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content.'" *Fed. Trade Comm'n v. LeadClick Media, LLC*, 838 F.3d 158, 174 (2d Cir. 2016) (citing *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997)). Thus, the question here is whether Plaintiffs' claims under the TVPRA "inherently require the court to treat the defendant as the 'publisher or speaker' of content provided by another." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009).

In *G.G. v. Salesforce*, the Seventh Circuit held that Salesforce was not being treated as a publisher or speaker of third-party content under identical facts. 76 F.4th 544, 567–68 (7th Cir. 2023). The Seventh Circuit explained that the plaintiffs' claims sought to hold Salesforce liable "for its own acts or practices, rather than for publishing content created by another." *Id.* at 567 (alterations and citations omitted). Indeed, the crux of the plaintiffs' case, the Seventh Circuit observed, was Salesforce's conduct in assisting Backpage:

> [P]laintiffs [sought] to hold Salesforce accountable for supporting Backpage, for expanding Backpage's business, for providing Backpage with technology, for designing custom software for Backpage, for facilitating the trafficking of [plaintiffs],

for helping Backpage with managing its customer relationships, streamlining its business practices, and improving its profitability, and for enabling Backpage to scale its operations and increase the trafficking conducted on Backpage.

*Id.* (emphasis omitted). Backpage had published all of the third-party content at issue in the case, and "Salesforce was simply not involved in any [of that] publishing." *Id.* Therefore, the Seventh Circuit concluded that, because plaintiffs' claims did not treat Salesforce as a publisher or speaker of third-party information, the CDA's grant of immunity did not apply. *Id.* at 568.

While Salesforce implicitly concedes that *G.G.* would be dispositive of the CDA issue here, it argues that the case is inconsistent with the Fifth Circuit's ruling in *Doe v. MySpace*, 528 F.3d 413. Doc. 42, Reply, 9–10. In *MySpace*, an underage girl was sexually assaulted after she connected with an adult man on a social media platform. 528 F.3d at 416. The girl and her mother brought claims for gross and ordinary negligence against the social media platform for "its failure to implement measures that would have prevented [the girl] from communicating with [the predator]." *Id.* at 420. The Fifth Circuit held that, notwithstanding the nature of the action pleaded, the CDA afforded the defendant immunity because plaintiffs' claims were "merely another way of claiming that [defendant] was liable for publishing the communications and they speak to [defendant's] role as a publisher of online third-party-generated content." *Id.*

The Court disagrees that *MySpace* forecloses the result reached by the Seventh Circuit in *G.G.* In contrast to *G.G.*, the claim at issue in *MySpace* existed solely because the defendant's platform published the third-party's content. *See MySpace* 528 F.3d at 419–20. As the district court in *MySpace* observed, "[i]f [defendant] had not published communications between [the girl] and [the assailant], including personal contact information, . . . they never would have met and the sexual assault never would have occurred." *Id.* (quoting *Doe v. MySpace, Inc.*, 474 F. Supp. 2d 843, 849 (W.D. Tex. 2007)). And while plaintiffs' claims challenged defendant's policy which allowed

the publication—rather than the publication itself—that policy "'relat[ed] to the monitoring, screening, and deletion of content from its network—actions quintessentially related to a publisher's role.'" *Id.* at 420 (quoting *Green v. Am. Online (AOL)*, 318 F.3d 465, 471 (3d Cir. 2003)). However, in *G.G.*, the Seventh Circuit found that "Salesforce was simply not involved in any publishing." 76 F.4th at 567. Thus, *G.G.* is distinguishable because the plaintiffs' claims in that case did not stem from defendant's publication of content, nor did plaintiffs challenge a policy which implicated the defendant's publishing function. *Compare id.*, *with MySpace* 528 F.3d at 419–20. As such, *MySpace* is not inconsistent with the Seventh Circuit's decision in *G.G.*

Although not binding authority, the Court finds the Seventh Circuit's reasoning persuasive and therefore reaches the same conclusion. Plaintiffs' case arises out of ads posted on Backpage. Plaintiffs here seek to hold Backpage liable as a publisher because they claim that Backpage violated sex-trafficking laws by publishing illicit advertisements. *See Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 19 (1st Cir. 2016); Doc. 1, Compl., ¶¶ 101–104; *see also See G.G.*, 76 F.4th at 567, n.24; 47 U.S.C. § 230(e)(5). Salesforce, however, did not publish the sex-trafficking advertisements at issue here or otherwise exercise editorial control over this content, and Plaintiffs do not seek to hold Salesforce liable for doing so. *See Zeran*, 129 F.3d at 331 ("[Section] 230 forbids the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions."); Doc. 1, Compl., ¶¶ 93–99. Instead, Plaintiffs seek to hold Salesforce liable for its conduct in helping a publisher—Backpage. Doc. 1, Compl., ¶¶ 93–99. Specifically, Plaintiffs claim that Salesforce is liable under the TVPRA for the tools and services it provided that enabled Backpage to expand its business of selling advertisements, but this conduct does not implicate Salesforce's role as a publisher. *Barnes*, 570 F.3d at 1102 ("[P]ublication involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party

content."). And because Salesforce's provision of tools and services to Backpage does not amount to the publication of third-party content, Plaintiffs' claims do not treat Salesforce as the "publisher or speaker" of content. *See id.*

Salesforce's arguments to the contrary are unpersuasive. Salesforce argues that the CDA bars Plaintiffs' claims "because third-party content is a necessary part of the events giving rise to plaintiffs' claims." Doc. 26, Mot. Dismiss Br., 20. This argument fails because it contravenes the plain language of the CDA. Immunity under the CDA only attaches when the claim treats a defendant "as a publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Thus, while third-party content may be a necessary predicate to the application of the CDA, it is insufficient by itself unless a claim also treats the defendant as the publisher of that third-party content. *See Jones v. Dirty World Ent. Recordings LLC*, 755 F.3d 398, 408 (6th Cir. 2014) ("If a website displays content that is created entirely by third parties, then it is only a service provider with respect to that content—and thus [the website] is immune from claims predicated on that content." (emphasis added)). And here, Salesforce is simply not being treated as the publisher of third-party content.[4]

In sum, the Court concludes that Plaintiffs' claims do not treat Salesforce as the publisher or speaker of the content at issue here. As such, the CDA does not immunize Salesforce from

---

[4] The Court also notes that while Backpage is being treated as a publisher of third-party content, under the allegations here, it appears that Backpage would not be entitled to immunity under the CDA. This is because Backpage is alleged to have committed a violation § 1591(a) in publishing third-party content. *See* G.G., 76 F.4th at 567, n.24; 47 U.S.C. § 230(e)(5) ("Nothing in this section . . . shall be construed to impair or limit . . . any claim in a civil action brought under section 1595 of Title 18, if the conduct underlying the claim constitutes a violation of section 1591 of that title."). It would be anomalous for CDA to strip immunity from the actual publisher of the third-party content but immunize those who merely assisted that publisher.

Plaintiffs' claims. Therefore, the Court **DENIES** Salesforce's Motion to Dismiss for immunity under the CDA.

C.      *12(b)(6) Failure to State a Claim*

Lastly, Salesforce argues that it is entitled to dismissal under Federal Rule of Civil Procedure 12(b)(6) because Plaintiffs have failed to state a plausible claim for relief. The Court agrees with Salesforce because Plaintiffs have failed to establish that Salesforce had constructive knowledge that Backpage violated relevant sex-trafficking laws as to Plaintiffs.

Whereas 18 U.S.C. § 1591 proscribes sex trafficking as a criminal offense, 18 U.S.C. § 1595, which is at issue in this case, creates a civil cause of action for victims of § 1591 violations. Under § 1591, it is a criminal offense to knowingly "recruit[], entice[], harbor[], transports[], provide[], obtain[], advertise[], maintain[], patronize[], or solicit[] . . . a person" with knowledge that the victim will be compelled to commit a commercial sex act through force, threats of force, fraud, or coercion. Where a person has been trafficked in violation of § 1591, she may sue those responsible under § 1595:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of . . . [§ 1591]) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595(a).

Plaintiffs here bring a § 1595 cause of action for participant liability against Salesforce. To prevail on a participant liability claim, a plaintiff must, as a threshold matter demonstrate that she is a "victim" of a § 1591 violation. *Id.* If she is, the plaintiff must then prove the following elements: (1) a venture has engaged in an act in violation of Section 1591, (2) the defendant participated in

that venture, (3) the defendant knew or should have known that the venture had violated § 1591, and (4) the defendant knowingly benefited from its participation. *See G.G.*, 76 F.4th at 553; *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 723 (11th Cir. 2021).

Salesforce moves for dismissal, arguing that Plaintiffs have failed to plausibly allege several elements of their claim. *See* Doc. 26, Mot., 25–29. Salesforce does not argue that Plaintiffs have failed to adequately allege that they are victims of § 1591 offenses. Nor does Salesforce appear to contend that the allegations are insufficient to support a plausible inference as to the first element of Plaintiffs' claims—that a venture violated § 1591 as to Plaintiffs. Instead, Salesforce argues that Plaintiffs failed to plead that (1) Salesforce participated in the venture which violated § 1591; (2) Salesforce had constructive knowledge that the venture violated § 1591; and (3) Salesforce knowingly benefited from its participation. *Id.* The Court considers the sufficiency of the pleadings as to each of these elements in turn.

### 1.    Participation

By its terms, § 1595 only permits recovery where the defendant knowingly benefits "from participation in a venture." 18 U.S.C. § 1595(a). The term "participation in a venture" is defined in a separate section of the TVPRA as "knowingly assisting, supporting, or facilitating a violation of" § 1591(a)(1). *Id.* § 1591(e)(4). However, courts have generally found that this definition is inapplicable to § 1595. *See, e.g., Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 724 (11th Cir. 2021); *G.G.*, 76 F.4th at 558–59; *E.S. v. Best W. Int'l, Inc.*, 510 F. Supp. 3d 420, 427 (N.D. Tex. 2021) (Lynn, C.J.); *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 969 (S.D. Ohio 2019).

There are two primary reasons why cases find § 1591(e)(4)'s definition inapplicable in a civil action brought under § 1595(a). First, these courts observe that § 1591 expressly limits the applicability of the definitions contained therein. *See G.G.*, 76 F.4th at 559 n.14. Section 1591 only

states that "[i]n this section . . . [t]he term 'participation in a venture' means knowingly assisting, supporting, or facilitating a violation of subsection (a)(1)." 18 U.S.C. § 1591(e)(4). Thus, "by its plain terms, the definition applies only to the phrase as used in Section 1591 of the statute." *Red Roof Inns*, 21 F.4th at 724; *See G.G.*, 76 F.4th at 559 n. 14. Second, courts have reasoned that importing § 1591's definition would render the "known or should have known" language in § 1595(a) superfluous. *See Red Roof Inns*, 21 F.4th at 724; *See G.G.*, 76 F.4th at 559 n. 14; *Best W. Int'l*, 510 F. Supp. 3d at 427. As the Eleventh Circuit has explained,

> [T]he civil provisions of Section 1595(a) make no sense with Section 1591's definition of "participation in a venture" read in. . . . If we replace "participation in a venture" with Section 1591(e)(4)'s "knowingly assisting, supporting, or facilitating a violation of sub-section (a)(1)," we get a nonsense sentence: benefited "from knowingly assisting, supporting, or facilitating a violation of subsection (a)(1) which that person knew or should have known has engaged in an act in violation of this chapter." In other words, the [defendants]' formulation requires a plaintiff to prove that the defendant knowingly facilitated a violation, making the "should have known" language superfluous.

*Red Roof Inns*, 21 F.4th at 724 (alterations omitted).

In light of the overwhelming weight of authority,[5] the Court accepts that § 1591's definition is inapplicable here.

---

[5] The Court is not entirely convinced that § 1591(e)(4)'s definition would render § 1595(a) superfluous. Under § 1591(a)(2), it is a criminal offense to knowingly benefit "from participation in a venture which has engaged in an act described in violation of paragraph (1), knowing . . . that means of force, threats of force, fraud, coercion . . . will be used to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a)(2). If the Court were to import § 1591's definition of "participation in a venture" into this provision, it would read: it is a criminal offense to knowingly benefit "from [*knowingly* assisting, supporting, or facilitating a violation of subsection (a)(1)] which has engaged in an act described in violation of paragraph (1), *knowing* . . . that means of force, threats of force, fraud, coercion . . . will be used to cause the person to engage in a commercial sex act." *See id.* § 1591(a)(2), (e)(4) (emphasis added). A plausible reading of § 1591(e)(4) would limit the "knowingly" *mens rea* to the act of assistance or support provided to another—not that the participant know that he is assisting a sex-trafficking violation. Thus understood, one can knowingly "participate in a venture" under § 1591(e)(4) without any knowledge that the venture has engaged in a violation of this chapter. For example, one can knowingly assist or facilitate another in transporting a person but lack any knowledge that this person will be forced to engage in commercial sex acts. Indeed, if "participation in a venture" means not only that the participant know that he is "assisting,

Courts rejecting § 1591's definition have instead interpreted "participation in a venture" in a variety of ways. Particularly relevant to this case is the Seventh Circuit's interpretation. *See G.G.*, 76 F.4th at 558–60. In G.G., the Seventh Circuit stated that "participation" means the "culpable assistance to a wrongdoer, which requires only a desire to promote the wrongful venture's success, though . . . . [it] does not require actual knowledge of criminal wrongdoing." *Id.* at 559 (citations omitted). And culpable assistance can be established "[w]here the participant provides assistance, support, or facilitation to the trafficker through . . . a continuous business relationship." *Id.* (citations omitted). The Seventh Circuit ultimately concluded that all that is needed to survive a 12(b)(6) motion are allegations that show the existence of "continuous business relationship," which plausibly demonstrates "that the civil defendant facilitated the venture's success." *Id.* at 560.

Applying that standard, the Seventh Circuit concluded that plaintiffs sufficiently alleged participation in a venture under factual allegations identical to the case at bar. *Id.* at 560–64. The Seventh Circuit emphasized that Salesforce and Backpage entered into a series of contracts, pursuant to which "Salesforce provided Backpage with targeted solutions addressed to the needs of Backpage's business, repeatedly assessed Backpage's operational needs, and provided active, ongoing support that was tailored to those needs." *Id.* at 560 (quotations omitted). And with Salesforce's help, "Backpage was able to build relationships with more street-level traffickers, to increase the scale of its operations, and to increase the trafficking conducted through its site." *Id.* (quotations and alterations omitted). The Seventh Circuit concluded that these allegations were

---

supporting, or facilitating" another engage in an act described in § 1591(a)(1), but also that the participant know that he is assisting, supporting, or facilitating the commission of a sex trafficking offense, then the hanging paragraph of § 1591(a)(2)—which requires that the participant know "that means of force, threats of force, fraud, coercion . . . will be used to cause the person to engage in a commercial sex act"—would seem to be of no effect as applied to § 1591(a)(2). *See* 18 U.S.C. § 1591(a)(2), (e)(4).

sufficient to constitute participation because they established a "continuous business relationship" between Backpage and Salesforce that "facilitated the growth of Backpage's business." *Id.*

Salesforce argues that the Seventh Circuit's interpretation is inconsistent with general principles of secondary liability and asks the Court to instead apply the definition of "participation in a venture" adopted by the Eleventh Circuit. Doc. 42, Reply, 14–15.

The Eleventh Circuit defines "participation in a venture" in slightly different terms than the Seventh Circuit. *Compare G.G.*, 76 F.4th at 558–60, *with Red Roof Inns*, 21 F.4th at 724–25. Looking to the dictionary definition of the relevant terms, the Eleventh Circuit interpreted "participation in a venture" under § 1595(a) to mean that the alleged participant "took part in a common undertaking or enterprise involving risk and potential profit."[6] *Red Roof Inns*, 21 F.4th at 724–25.

The Eleventh Circuit explained that allegations like those before the First Circuit in *Ricchio v. McLean* would be sufficient show that a defendant took part in a common undertaking or enterprise involving risk and potential profit. *Id.* at 725–26 (citing *Ricchio v. McLean*, 853 F.3d 553, 556–58 (1st Cir. 2017)). The plaintiff in *Ricchio* brought a § 1595(a) action against owners and operators of a motel for renting a room to plaintiff's trafficker who proceeded to traffic plaintiff out of the motel. 853 F.3d at 555. Plaintiff alleged that her trafficker "'had prior commercial dealings with the [operators], which the parties wished to reinstate for profit.'" *Red Roof Inns*, 21 F.4th at 725 (alteration in original) (quoting *Ricchio*, 853 F.3d at 555). The First Circuit concluded that such allegations supported the inference that, "by renting a room to the [trafficker], the operators

---

[6] The District of Columbia Circuit defines participation in a venture in substantially similar terms. *See Doe 1 v. Apple Inc.*, No. 21-7135, 2024 WL 925889, at *8 (D.C. Cir. Mar. 5, 2024) ("[Participation in a venture means] taking part or sharing in an enterprise or undertaking that involves danger, uncertainty, or risk, and potential gain.").

were 'associating with him in an effort to force [the plaintiff] to serve their business objective.'" *Id.* at 726 (alteration in original) (quoting *Ricchio*, 853 F.3d at 555). In the Eleventh Circuit's view, "these kinds of allegations would establish a hotel operator's participation in a venture with a sex trafficker." *Id.*

However, under the Eleventh Circuit's definition, it is insufficient that the alleged participant merely acquiesced in a venture's commercial activities. *See Red Roof Inns*, 21 F.4th at 726–27; *K.H. v. Riti, Inc.*, No. 23-11682, 2024 WL 505063, at *3 (11th Cir. Feb. 9, 2024). For example, in *K.H. v. Riti*, the Eleventh Circuit held that allegations that a defendant hotel operator should have known that sex trafficking occurred on it premises yet nevertheless rented rooms to plaintiff's trafficker were insufficient to show that the defendant participated in a venture. 2024 WL 505063, at *3. The plaintiff in *Riti* alleged that she was trafficked out of defendant's hotel over a four-year period, during which time she was repeatedly sexually assaulted. *Id.* at *1. There were also allegations that the defendant hotel "should have been aware of [plaintiff's] trafficking" because it managed, trained, and supervised the entire staff and because online reviews reported that the hotel was being used for sex trafficking. *Id.* The Eleventh Circuit found that these allegations failed to show that the defendant hotel "took part in a common sex trafficking undertaking or enterprise with [plaintiff's trafficker]." *Id.* In the Court's view, the allegations only supported an inference that the defendant hotel "benefitted from renting hotel rooms to [plaintiff's] trafficker and that [defendant] observed signs of sex trafficking at the hotel." *Id.* at *4. But, as the Eleventh Circuit explained, "allegations of financial benefit alone are not sufficient to establish that the defendant participated in a sex trafficking venture and observing signs of sex trafficking 'is not the same as participating in it.'" *Id.* (quoting *Red Roof Inns*, 21 F.4th at 726).

Salesforce contends that Plaintiffs' pleadings here fail for reasons similar to those articulated by the Eleventh Circuit in *Riti*. *See* Doc. 26, Mot. Dismiss Br., 27–28. According to Salesforce, the Complaint only establishes that Salesforce provided software, technical support, and licenses to Backpage. *Id.* at 27. Salesforce argues that such allegations are insufficient because "[i]t is not enough to provide business software or services to another company—rather a defendant must 'take part in a common undertaking or enterprise that violates [§] 1591 as to the plaintiff." Doc. 42, Reply, 14.

Implicit in Salesforce's argument is that Eleventh Circuit's interpretation of "participation in a venture" is incompatible with the Seventh Circuit's. *Compare* Doc. 26, Mot. Dismiss Br., 27–28, *with* Doc. 42, Reply, 14. However, the Court sees no substantive distinction between the two. To be sure, they employ different terms in defining "participation in a venture." *Compare G.G.*, 76 F.4th at 559–60, *with Red Roof Inns*, 21 F.4th at 725. But the Court is not persuaded that there is a meaningful difference between "assistance, support, or facilitation to the trafficker through . . . a continuous business relationship," *G.G.*, 76 F.4th at 559, and "[taking] part in a common undertaking or enterprise involving risk and potential profit." *Red Roof Inns*, 21 F.4th at 725. Both definitions require that the alleged participant have an ongoing interest in the success of a specific venture and elect to further the ends of the venture beyond what would reasonably be expected in an ordinary commercial transaction. *See G.G.*, 76 F.4th at 559–60; *Red Roof Inns*, 21 F.4th at 725; *see also Riti*, 2024 WL 505063, at *2–4; *Ricchio*, 853 F.3d at 555–58; *Apple Inc.*, 2024 WL 925889, at *9.

Regardless, the pleadings plausibly establish that Salesforce participated in a venture within the meaning of § 1595(a) under any definition of the term. According to Plaintiffs, Backpage wanted to form a partnership with Salesforce for the express purpose of expanding its business

operations. Doc. 1, Compl., ¶¶ 40–41. During initial contract negotiations, Salesforce allegedly met with Backpage executives to learn about Backpage "as a business" and to "assess and evaluate Backpage's needs and goals." *Id.* ¶ 66 (quotations omitted). Salesforce allegedly agreed to be Backpage's partner, and the two entities memorialized their relationship over a series of contracts that lasted several years. *Id.* ¶¶ 18, 41, 84. Under those contracts, Salesforce did much more than simply provide Backpage with standardized, off-the-shelf products and services; Salesforce provided technical support tailored to Backpage's specific business needs. *Id.* ¶¶ 49, 79. Plaintiffs claim that Salesforce designed and built Backpage's custom CRM platform, personally assisted Backpage in integrating Backpage's data onto that platform, and provided Backpage with "ongoing operation support for the technology tools and instruments" that it sold. *Id.* ¶¶ 50, 53–53, 63. On one occasion, "Backpage's needs were so specific that Salesforce negotiated, assisted, and arranged for Backpage to be able to move its operations overseas." *Id.* ¶ 70. Similarly, when Backpage came under scrutiny "surrounding . . . credit card companies' refusal to process their transactions due to the nature of Backpage's business," *id.* ¶ 81, Plaintiffs claim that "Salesforce addressed a unique need in Backpage's business by creating a duplicate copy of Backpage's system and in doing so directly assisted Backpage in evading law enforcement scrutiny." *Id.* ¶¶ 79, 81. Plaintiff further allege that Salesforce's partnership was instrumental to Backpage's success as a business. *Id.* ¶¶ 71, 76. According to Plaintiffs, "through the use of Salesforce's tools and instruments, Backpage's business exponentially grew requiring the scope of work covered by the Salesforce contract to grow as well." *Id.* ¶ 76. The relationship between Backpage and Salesforce was so successful, that Backpage allegedly "boasted of its relationship with Salesforce to its investors." *Id.* ¶ 71.

These allegations plainly demonstrate that Salesforce participated in a venture with Backpage. Salesforce had a continuing interest in the success of Backpages business throughout

the course of their contractual relationship and elected to help Backpage achieve its operational goals by providing tools and services tailored to Backpage's specific needs. *See G.G.*, 76 F.4th at 559–60; *Red Roof Inns*, 21 F.4th at 725. Or, put a different way, Salesforce and Backpage had an ongoing "commercial relationship" that ultimately "facilitate[ed] the success of Backpage's business." *See G.G.*, 76 F.4th at 559. For these same reasons it could likewise be said that Salesforce "took part in . . . an enterprise involving risk and potential profit." *See Red Roof Inns*, 21 F.4th at 725. As in *Ricchio*, Plaintiffs here have alleged that their trafficker—Backpage—had extensive commercial dealings with Salesforce that was profitable for both parties. *See* Doc. 1, Compl., ¶¶ 18, 41, 84; *Ricchio*, 853 F.3d at 555. The Court may infer from this relationship, that Salesforce was "associating with [Backpage] in an effort . . . to serve their business objective"—namely, successfully scaling Backpage's business operations. *See* Doc. 1, Compl., ¶¶ 18, 41, 84; *Ricchio*, 853 F.3d at 555; *see also Red Roof Inns*, 21 F.4th at 725–26. And in contrast to *Riti*, here, Salesforce did much more than merely acquiesce in the alleged trafficker's commercial activities. *Compare Riti*, 2024 WL 505063, at *2–4, *with* Doc. 1, Compl., ¶¶ 50, 53–53, 63, 79. Salesforce worked hand-in-hand with Backpage for years, provided personalized services and software to Backpage, and frequently met with Backpage's representatives in order to better serve Backpage's business. Doc. 1, Compl., ¶¶ 50, 53–53, 63, 79. Thus, Salesforce did not simply observe the venture's commercial operations; Salesforce actively engaged with the venture and was an integral part of the venture's success.

Whichever verbiage one prefers, Salesforce participated in a venture under the meaning of § 1595(a). And because the pleadings establish this venture committed wide scale sex-trafficking

violations,[7] Plaintiffs have adequately alleged that Salesforce "participated in a venture . . . which engaged in a violation of this chapter." 18 U.S.C. § 1595(a). For these reasons, the Court concludes that Plaintiffs have properly pleaded that Salesforce participated in a venture under § 1595(a).

### 2.   Constructive Knowledge

Participant liability under § 1595 is only available where the participant "knew or should have known [the venture] has engaged in an act in violation of [§ 1591]." 18 U.S.C. § 1595(a). While § 1595(a) could be read such as to render one's participation actionable whenever the participant has constructive knowledge that a venture committed *any* act in violation of § 1591, the majority view appears to require that defendant have constructive knowledge that the venture committed the specific § 1591 violation sued upon in the § 1595 civil action. *See e.g., J.L. v. Best W. Int'l, Inc.*, 521 F. Supp. 3d 1048, 1067 (D. Colo. 2021) ("[P]laintiff's allegations are insufficient to establish either actual knowledge or that [defendant] should have known about plaintiff's trafficking."); *Doe #9 v. Wyndham Hotels & Resorts, Inc.*, No. 4:19-CV-5016, 2021 WL 1186333,

---

[7] The Court notes that, under the facts alleged here, it is not necessary to show that Salesforce had knowledge that the venture (i.e., Backpage) was engaged in illegal activities to establish "participation in a venture." While § 1595(a) cases dealing with hotel operators frequently emphasize whether hotel operator did or did not have reason to know of sex trafficking in determining whether pleadings properly allege participation in a venture, such cases are distinguishable because they almost exclusively deal with sex trafficking ventures specifically. *See e.g., Red Roof Inns*, 21 F.4th at 726. In order to participate in a venture, a person must know that a specific venture exists. *See id.* 727 ("Their only allegations as to the franchisors' knowledge . . . of those sex trafficking ventures are that the franchisors sent inspectors to the hotels who would have seen signs of sex trafficking and that they received reviews mentioning sex work occurring at the hotels."); *G.G.*, 76 F. 4th at 557 ("[T]he civil defendant . . . [must] have constructive knowledge of a non-generalized and non-sporadic—a 'particular'—venture."). Thus, because hotel cases most often deal with sex trafficking ventures specifically, knowledge of the venture will necessarily require knowledge of the underlying sex trafficking. *See G.G.*, 76 F. 4th at 561–62 (explaining the key distinction between sex trafficking ventures specifically and commercial ventures which violate sex trafficking laws). Here, by contrast, Plaintiffs allege the existence of a "business venture." Doc. 1, Compl., ¶ 20. And Salesforce knew all along that Backpage was a business venture, albeit a legitimate one. Thus, because Salesforce knew Backpage was a venture, it does not matter whether it knew of any alleged illicit conduct. *See G.G.*, 76 F. 4th at 561–62. A participant's awareness of the venture's illegal conduct is a separate question addressed under the constructive knowledge prong. *See infra.*

at *1 (S.D. Tex. Mar. 30, 2021) ("[T]he complaint must contain facts sufficient to establish that the defendant knew or should have known about the trafficking of the plaintiff in particular."); *see also E.S.*, 510 F. Supp. 3d at 428; *See Red Roof Inns*, 21 F.4th at 725; *A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d 171, 192–93 (E.D. Pa. 2020); *Doe v. Mindgeek USA Inc.,* 558 F. Supp. 3d 828, 839 (C.D. Cal. 2021); *A.B. v. Hilton Worldwide Holdings Inc.*, 484 F. Supp. 3d 921, 938 (D. Or. 2020).

Some courts, however, do not require constructive knowledge of the specific violation giving rise to the civil claim. *See G.G.*, 76 F.4th at 558; *M. L. v. craigslist Inc.*, No. C19-6153 BHS-TLF, 2020 WL 5494903, at *6 (W.D. Wash. Sept. 11, 2020). For example, in G.G., the Seventh Circuit held that plaintiffs in a TVPRA case sufficiently pleaded constructive knowledge where the allegations raised a plausible inference that "[the defendant] at least should have known that Backpage was engaged in criminal sex trafficking on a substantial scale." 76 F.4th at 556. The Court rejected defendant's argument that "an act in violation of this chapter" required constructive knowledge of the specific act sued upon, but explained that even if it did, there "was no reason to require knowledge of a particular act to require knowledge of the victim's identity." *Id.* A contrary result, the Seventh Circuit continued, would mean "that the larger the sex-trafficking venture and the more extensive its participation in the venture—and so the less likely it is to have known the specifics of individual victims—the harder it should be for a victim to obtain civil relief." *Id.* Accordingly, the Court concluded that "a plaintiff need[] . . . [only] allege . . . that the defendant had constructive knowledge that a venture generally has violated Section 1591." *Id.* at 558.

The parties' arguments concerning the constructive knowledge requirement mirror the two competing points of view. Salesforce relies on the majority position and argues that a participant must have constructive knowledge that the venture violated § 1591 as to the specific victim. Doc. 26, Mot. Dismiss Br., 25–26. Plaintiffs rely on the minority view and argue that constructive

knowledge that a venture has generally violated sex trafficking laws is sufficient. Doc. 30, Resp., 26–28.

In this Court's view, the TVPRA requires constructive knowledge of the specific violation sued upon for two reasons. First, requiring a showing of constructive knowledge with respect to the specific violation comports with the consensus among courts that § 1595(a) imposes a negligence standard. *See A.C. v. Red Roof Inns, Inc.*, No. 2:19-CV-4965, 2020 WL 3256261, at *4 (S.D. Ohio June 16, 2020) ([T]he plain text of § 1595(a) makes clear that the standard under this section is a negligence standard of constructive knowledge, not actual knowledge."); *Best W. Int'l*, 521 F. Supp. 3d at 1076 ("The knowledge requirement in § 1595 is not recklessness or actual knowledge, but rather negligence."); *Doe (L.M.) v. 42 Hotel Raleigh, LLC*, No. 5:23-CV-235-FL, 2024 WL 631482, at *5 (E.D.N.C. Feb. 13, 2024) ("[C]ourts applying this element have adopted a negligence standard requiring that the defendant hotel should have known of sex trafficking." (citations omitted)); *see also G.G.*, 76 F.4th at 559 n.9 (collecting cases that state § 1595(a) imposes a negligence standard). If participant liability could attach without any knowledge the venture committed the specific violation sued upon, then § 1595(a) would impose strict liability for participants in the event they have constructive knowledge of any violation. For example, a person can participate in a venture that violates § 1591 as to one hundred individuals; however, the participant may only have constructive knowledge that the venture violated § 1591 as to one of these individuals. If constructive knowledge of *any* act in violation of the TVPRA is sufficient, then the participant can be liable to the remaining ninety-nine even though he may not have had any knowledge (constructive or otherwise) that the venture violated § 1591 as to these individuals. *See* 18 U.S.C. § 1591(a). Such an interpretation would be inconsistent with the consensus among the

courts that § 1595 imposes a negligence standard. *See A.C.*, 2020 WL 3256261, at \*4; *Best W. Int'l*, 521 F. Supp. 3d at 1076; *42 Hotel Raleigh*, 2024 WL 631482, at \*5.

Second, the term "a venture" has likewise not been interpreted to mean "any venture." *See e.g.*, *S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d 147, 154 (E.D.N.Y. 2020) ("The statutory text speaks in singular terms–'participation in a venture which that person . . . should have known has engaged in an act in violation of this chapter.'" (alterations in original) (citations omitted)). Section 1595 allows a victim to sue "whoever . . . benefits . . . from participation in *a* venture which that person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a) (emphasis added). Plaintiffs' position rests on interpreting "an act in violation of this chapter" to mean "any act in violation of this chapter." *See* Doc. 30, Resp., 27; *see also G.G.*, 76 F.4th at 556.  However, the only other indefinite article used in this portion of § 1595(a)—"a venture"—has not interpreted to mean "any venture"; rather, courts are in agreement that a defendant must have participated in *the specific* venture which violated § 1591 as to the plaintiff. *See Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d at 154; *Hilton Worldwide Holdings*, 484 F. Supp. 3d at 938; *Best W. Int'l*, 521 F. Supp. 3d at 1064. The Court is not persuaded that Congress used two indefinite articles in § 1591 but intended them to mean something materially different. Therefore, given that the phrase "a venture" has been interpreted to mean "the venture," the phrase "an act" should be interpreted to mean "the act" as well.

For these reasons, the Court concludes that that the relevant knowledge for purposes of a § 1595 claim is the participant's knowledge with respect to the specific act in violation of § 1591 that the plaintiff is suing on. As relevant here, § 1591 provides that it is a criminal offense to "advertise . . . a person . . . knowing . . . that means of force, threats of force, fraud, coercion . . .

will be used to cause the person to engage in a commercial sex act."[8] 18 U.S.C. § 1591(a)(1). Plaintiffs contend Backpage violated § 1591 as to them by advertising Plaintiffs with knowledge that they would be forced to engage in commercial sex acts. Doc. 1, Compl., ¶¶ 93–99; Doc. 30, Resp., 25–28. Because Plaintiffs are required to show that Salesforce had constructive knowledge of the specific § 1591 offense sued upon, the pleadings must plausibly establish that Salesforce knew or should have known (1) that each Plaintiff was advertised and (2) that each Plaintiff would be forced to engage in commercial sex acts by illicit means.[9] *See* 18 U.S.C. § 1591(a)(1); *see also Red Roof Inns*, 21 F.4th at 726 ("Knowledge requires an awareness or understanding of a fact or circumstance. . . . [and] [c]onstructive knowledge . . . is that knowledge which one using reasonable care or diligence should have." (citations and alterations omitted)).

However, that a plaintiff must ultimately establish constructive knowledge as to the specific § 1591 violation does not mean that a participant's knowledge of general sex trafficking violations is irrelevant. *See Mindgeek USA*, 558 F. Supp. 3d at 839; *Doe #1 v. MG Freesites, LTD*, No. 7:21-CV-00220-LSC, 2022 WL 407147, at *20 (N.D. Ala. Feb. 9, 2022). Indeed, general knowledge of sex trafficking violations often informs the constructive knowledge analysis. *See Mindgeek USA*,

---

[8] Section 1591 also makes it a crime to advertise a person knowing that the person will be forced to engage in a commercial sex act and is a minor. 18 U.S.C. § 1591(a). However, Lead Plaintiff's Complaint does not claim that Lead Plaintiff was a minor at the time of the alleged sex trafficking. *See generally* Doc. 1, Compl. As Plaintiffs' Response indicates, Lead Plaintiffs' Complaint "is substantively identical to the live pleadings in the other cases currently pending before this Court." Doc. 30, Reps., 2. Therefore, the Court assumes that each Plaintiff in this case was an adult when the alleged sex trafficking occurred.

[9] It is important to remember that that the conduct which constitutes sex trafficking under § 1591(a) includes more than just the commercial sex act itself. It includes recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, and soliciting a person with the requisite scienter. 18 U.S.C. § 1591(a). Each one of these acts is a distinct sex-trafficking offense—one who advertises and then transports a person (with the requisite knowledge) has committed two offenses under the TVPRA. Here, although plaintiffs allege that they are the victims of numerous sex trafficking offenses, they only argue that Salesforce knew or should have known that Backpage's business—which advertised Plaintiffs—was violative of § 1591.

558 F. Supp. 3d at 839; *MG Freesites*, 2022 WL 407147, at *20. Nor does constructive knowledge require actual knowledge of the victim's identity. *See G.G.*, 76 F.4th at 557. As the plain language of § 1595(a) makes clear, it is sufficient that the participant "should have known" that the venture violated sex trafficking laws as to plaintiff. 18 U.S.C. § 1595(a). Thus, in the context of this case, it is not necessary to show the participant had actual knowledge of the Plaintiffs' identity or even saw the advertisement in question—what matters is whether the participant should have seen the advertisements and whether the participant should have known these advertisements violated § 1591. *Id.*; *see e.g.*, *MG Freesites*, 2022 WL 407147, at *20.

To determine whether a participant has constructive knowledge of the specific § 1591 violation sued upon, courts look at the totality of the circumstances alleged. *See Ricchio*, 853 F.3d at 557 ("[W]e give attention to the whole body of allegations as circumstantially supplying meaning to particular acts."). Where the underlying sex trafficking violation occurs through the internet, courts have considered the following facts relevant to the constructive knowledge inquiry: (1) whether the participant was aware of a pervasive sex trafficking problem on its platform (2) whether the defendant implemented policies to prevent sex trafficking (3) whether the participant had access to the objectionable conduct; and (4) whether the objectionable conduct had apparent indicia of sex trafficking. *See Mindgeek USA*, 558 F. Supp. 3d at 839; *MG Freesites*, 2022 WL 407147, at *20.

The Central District of California's decision in *Doe v. Mindgeek* is illustrative. In that case, defendants, pornographic websites, were sued after the minor plaintiff's ex-boyfriend posted an explicit video of her on the defendants' websites. *Mindgeek USA*, 558 F. Supp. 3d at 832, 839. The court held that the websites should have known that the video of plaintiff violated § 1591 where plaintiff alleged that defendants reviewed, approved, and featured the video on their platforms,

and the video itself used "the word 'teen' in its title and was categorized as teen pornography." *Id.* at 839. Further, the person who posted the video—plaintiff's ex-boyfriend—had also "posted hundreds of videos to [d]efendants' platforms, victimizing other women." *Id.* And, the court observed, "[t]his was all done . . . when [d]efendants had actual knowledge of the pervasiveness of child pornography on their platforms, . . . and yet they still refused to implement basic protections against posting child pornography, such as age verification technology." *Id.* Under these circumstances, the court concluded that plaintiff had plausibly alleged that the websites had constructive knowledge of the specific § 1591 violation sued upon. *Id.*

Turning to the pleadings here, the Court concludes that while the allegations are sufficient to charge Salesforce with constructive knowledge of the fact that Plaintiffs were advertised on Backpage's platform, Plaintiffs have failed to demonstrate that Salesforce had constructive knowledge that those advertisements were violative of § 1591. Accordingly, the pleadings do not plausibly establish that Salesforce had constructive knowledge of the specific § 1591 violations sued upon.

Plaintiffs have plausibly alleged that Salesforce should have known of their advertisements. During Salesforce's alleged partnership with Backpage, 99% of Backpage's business came from selling adult advertisements; Salesforce necessarily would have been aware of this, since it needed to learn about Backpage's business in order to provide services and tools tailored to that business. *Id.* ¶¶ 9, 66, 79. It also appears from the pleadings that Salesforce retained the right to control and access Backpage's data, which the Court takes to mean that Salesforce could see the content of all the advertisements on Backpage's website. *See id.* ¶¶ 52. 59. Therefore, Salesforce necessarily could have seen Plaintiffs' advertisements. *See id.* Given Salesforce's knowledge of the nature of Backpage's business and the fact that Salesforce had access to content on Backpage's platform, the

Court may infer that Salesforce should have known that Plaintiffs were advertised. *See* 18 U.S.C. § 1595(a); *See Red Roof Inns*, 21 F.4th at 726 ("Constructive knowledge . . . is that knowledge which one using reasonable care or diligence should have." (citations and alterations omitted)).

However, while the allegations suffice to put Salesforce on notice of Plaintiffs' advertisements, there is nothing in the pleadings which would demonstrate that Salesforce should have known these advertisements violated sex trafficking laws. The only allegation relating to the advertisements at issue in this case is that "trafficker[s] paid money to Backpage to post ads selling [Plaintiffs] for sex." Doc. 1, Compl., ¶ 90. But knowledge that Plaintiffs were advertised for sex does not, by itself, amount to knowledge of a violation of § 1591. *See* 18 U.S.C. § 1591(a). The TVPRA only criminalizes the advertising of an adult person with the knowledge "that means of force, threats of force, fraud, coercion . . . will be used to cause the person to engage in a commercial sex act." *Id.* Thus, that Salesforce may have known Plaintiffs were advertised for sex does not permit the inference that Salesforce knew that these advertisements violated § 1591. *See id.* Plaintiffs must separately show that Salesforce knew or should have known that Plaintiffs would be forced to engage in commercial sex acts through force, fraud, or coercion. *See id.* Plaintiffs have not alleged any facts regarding their specific advertisements, the individuals who created them, or any other information that was available to Salesforce such that one may reasonably infer that Salesforce had constructive knowledge that force, fraud, or coercion would be used to make Plaintiffs engage in the commercial sex acts advertised on Backpage. *See Mindgeek USA*, 558 F. Supp. 3d at 839; *MG Freesites*, 2022 WL 407147, at *20. Put differently, even if Salesforce had in fact reviewed the Plaintiffs' advertisements on Backpage's platform, there is no fact alleged to support the inference that Salesforce should have known that these advertisements violated § 1591.

More fundamentally, Plaintiffs fail to plead any facts which would show that Salesforce should have known that *Backpage* had engaged in the specific sex trafficking violations sued upon. *See* 18 U.S.C. § 1595(a). To be sure, the Complaint alleges facts which are sufficient to have put Salesforce on notice of a widescale sex trafficking problem on Backpage's platform. *See* Doc. 1, Compl., ¶¶ 37–41. According to Plaintiffs, by the time Salesforce had begun its relationship with Backpage, law enforcement from every level of government had already identified Backpage as one of the biggest "sex trafficking and prostitution website[s] in the United States." *Id.* ¶ 37. However, in this case, there is crucial a distinction between knowledge that sex traffickers used a website and knowledge that the website itself is a sex trafficker—here Plaintiffs only allege that Salesforce participated in a venture with Backpage, not the street-level traffickers. *See id.* ¶¶ 18, 20–22, 30, 87; Doc. 30, Resp., 24–25. Thus, the fact that Salesforce may have had knowledge that sex traffickers used Backpage to violate § 1591 is insufficient because Salesforce did not participate in a venture with these traffickers. *See* 18 U.S.C. § 1595(a) ("An individual who is a victim of a violation of this chapter may bring a civil action against . . . whoever knowingly benefits . . . from *participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter.*" (emphasis added)); Doc. 1, Compl., ¶¶ 18, 20–22, 30, 87; Doc. 30, Resp., 24–25. Nor does such knowledge, by itself, support the inference that Salesforce knew or should have known that Backpage itself was engaging in sex trafficking violations at all, let alone with respect to particular advertisements. *See Red Roof Inns*, 21 F.4th at 726.

Instead, there must be some showing that Backpage had actual knowledge that each Plaintiff would be forced to engage in commercial sex acts by illicit means; if it were otherwise, then Salesforce did not participate in a venture which violated § 1591 as to Plaintiffs. *See* 18 U.S.C. §§ 1591(a), 1595(a); *see also G.G.* 76 F.4th at 553 ("Backpage violated Sections 1591(a)(1) and

(a)(2) when it advertised G.G. for sale after learning that she was a minor and financially benefited from participation in her street-level trafficking."). While Salesforce does not contest that Backpage had the requisite knowledge, *see* Doc. 26, Mot. Dismiss Br., 25–29, Plaintiffs must still show that Salesforce had constructive knowledge of Backpage's violation. *See* 18 U.S.C. §1595(a); *Red Roof Inns*, 21 F.4th at 726. And to do this, Plaintiffs must connect the facts establishing Backpage's knowledge of Plaintiffs' being sex trafficked through its website to Salesforce. They have failed to do so.

Therefore, Plaintiffs have failed to plausibly allege that Salesforce knew or should have known that the advertising of Plaintiffs on Backpage was in violation of § 1591.

### 3.   Knowingly Benefited

Lastly, Salesforce argues that Plaintiffs have failed to plausibly establish that it knowingly benefited from its participation. Doc. 26, Mot. Dismiss Br., 28–29. This element merely requires that "defendant knew it was receiving some value from participating in the alleged venture." *Red Roof Inns, Inc.*, 21 F.4th at 724. The allegations are sufficient here because Plaintiffs pleaded that Salesforce was paid by Backpage for the services and products it provided pursuant to their contracts. Doc. 1, Compl., ¶ 98. Accordingly, Plaintiffs have plausibly pleaded that Salesforce knowingly benefited from its participation.

\*\*\*

In sum, while Plaintiffs established that they are victims under the TVPRA, that a venture violated § 1591 as to them, and that Salesforce knowingly benefited from its participation in that venture, Plaintiffs have not plausibly alleged that Salesforce knew or should have known that this venture violated § 1591 as to them. At most, the pleadings demonstrate that Salesforce had constructive knowledge that Plaintiffs were advertised for sex on Backpage's website. However,

there are no facts alleged which would establish that Salesforce had constructive knowledge that this was violative of § 1591. Accordingly, Plaintiffs have failed to state a claim under § 1595, and Salesforce's Motion is **GRANTED**.

The Court will, however, grant Plaintiffs leave to amend in order to allow Plaintiffs to address the deficiency identified by the Court.

## IV.

## CONCLUSION

For these reasons, the Court **GRANTS** Salesforce's Motion. Plaintiffs' § 1595 claims against Salesforce are **DISMISSED** without prejudice. Should Plaintiffs elect to file an amended complaint, they must do so within twenty-one (21) days of this Order.

**SO ORDERED.**

**SIGNED: March 28, 2024.**

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE